DREW, J.
|, Alex Harris, a juvenile, died at Hope Youth Ranch (“HYR”) shortly after 3:00 p.m. on September 13, 2005. Three employees of HYR (Kelton Greenard, Arthur G. Henderson, III, and Anthony L. Combs) waived their rights to a jury trial and were convicted at a consolidated bench trial of both negligent homicide and cruelty to juveniles. They appeal, urging insufficiency of the evidence, erroneous admission of hearsay, and double jeopardy. Defendants failed to brief the hearsay issue, so we consider that assignment of error to be abandoned. La. URCA Rule 2-12.4.
We find the evidence in this record insufficient to prove beyond a reasonable doubt that the criminal negligence of these defendants caused the death of the child in question. Therefore, the negligent homicide convictions are reversed.
*241 This finding moots the defendant’s double jeopardy claim,[1] as our result is the same as if we had found a double jeopardy violation.
We affirm each of the cruelty to juveniles convictions and remand the matters for individualized resentencing.
I. SUFFICIENCY OF THE EVIDENCE
Our law on review for sufficiency of the evidence is well settled.[2]
| ,11. FACTUAL OVERVIEW
Because of Hurricane Katrina, dozens of juvenile justice residents were evacuated from south Louisiana to HYR, a juvenile residential facility located in rural Webster Parish, Louisiana. Two weeks after the storm, the local staff was stretched beyond tight, since few south Louisiana supervisory personnel remained at HYR.
On September 18, 2005, the temperature was in the 90s; the heat index was 103 degrees. Alex Harris, a small but apparently healthy child,[3] was a month shy of becoming 13 years of age,[4] and was a resident at HYR. A disruptive malingerer by reputation, Alex was an ungovernable child. He had been referred to HYR by the Louisiana Office of Human Development, an agency that had received the child into their care from the court system. As a result of his acting out, he was placed on in-school suspension. His punishment *242 commenced about 9:00 a.m. that day. A little over six hours 1,slater, he was dead. At all times that day, Alex was under the direct supervision of various employees of HYR.
After an inconclusive initial autopsy[5] by a forensic pathologist, an extensive investigation was conducted by the Louisiana State Police (“LSP”). Months later, the pathologist met with the LSP investigator and reviewed the LSP work product. The pathologist then amended the cause of death to “environmental hyperthermia[6] with blunt force head trauma.”
There are no heroes or winners in this sad tale, and there is no happy ending. The HYR hierarchy runs from the owners/managers/administrators at the very top, descending through various layers of supervisory personnel, all the way down to the lowest echelon- — the direct care staff, which included Greenard, Henderson, and Combs.
No one involved at HYR acquitted himself well in this tragedy. Possibly a dozen people could have made a difference, but no one did so. This is a story of institutional dysfunction, and it is not pretty. Exhibited that day was a systemic and callous indifference to the well-being of the residents at HYR, in particular the perceived troublemaker, Alex Harris. We agree with the trial court when it remarked, “I think what did occur, this is an indictment, of course, of the Hope Youth Ranch as a whole[.]”
Eight people were initially arrested. Charges against two[7] of these ^original eight were dismissed early on, with the proviso that each would testify truthfully if called at trial. Neither testified.
Six persons were later charged by bill of information. Dismissals were entered against three of them[8] on the morning of trial, on condition that they each testify truthfully, if called upon. None of the three testified.
Each defendant was sentenced to identical concurrent sentences of five years at hard labor, with three years suspended and two years of supervised probation after release, together with probationary conditions.
III. EIGHT WITNESSES
1. Christopher Haynes, HYR Agency Administrator, testified that HYR had no written policy on September 13, 2005, as to *243 running being an acceptable or unacceptable punishment for a resident placed on in-school suspension. Nor was there a policy on September 13, 2005, as to how direct care staff should respond to a resident vomiting, it being more of a “judgment call.” He did not think that these defendant ran or struck the residents that afternoon.
Little else in his evasive testimony was helpful.[9] The transcript is | sunclear as to whether Haynes was passing judgment on HYR reporting requirements and other issues in hindsight, relative to HYR policies on the day Alex died, or the HYR policies as of the date of trial. He did opine that these defendants did not violate any HYR policy.
2. Corey Zito, a teenager and former HYR resident, was 16 years of age on the date Alex died; he was 19 when he testified at trial. He and Alex were both on in-school suspension together for most of the day.
His memory was poor. For instance, he couldn’t even remember who of the direct care staff was with the suspended boys that morning. He also couldn’t recall who was with the juveniles that afternoon.
He did testify clearly that:
• Alex often tried to get out of doing his share of the work;
• he and Alex and others were worked hard that morning and made to “run the pipeline”[10] several times;
• during the morning, Alex kept falling and crying;
• in response to these complaints, the supervising direct care staff member picked him up and told him to “keep on walking”;
• after lunch, Alex was pale, falling, and crying that he couldn’t continue;
• these three defendants never made them run them that afternoon;
• Alex fell a couple of times while walking up the hill that afternoon, one fall being hard and straight back;
• the others began to drag Alex up the hill that afternoon, and they were “not gentle with him”;
• he did not think that the three defendants saw that the other Lboys were dragging Alex;
• either Jarred or James tried to carry Alex, but dropped him on his back and side, after/as Alex vomited on him;
• he (Corey Zito) “may have kicked Alex”;
• he did recall thinking that Alex was faking, at least initially;
• Alex was made to lie in the sun, not in the shade, while on the hill, and he mostly lay very still; and
• he never saw Alex drink any water that afternoon.
Zito said that none of the boys ever hit Alex that day. The autopsy photos belie that statement. He also testified that the others in the work crew mowed around Alex that afternoon; this could not be confirmed from the photos in the record. Much of Zito’s testimony was halting, unclear, evasive, and self-serving. He responded with “I don’t know” or “I don’t remember” or “I’m not sure” two dozen times.
3. Sidney Stephens, another former HYR resident, was 11 years old on September 13, 2005, and 14 as of the trial. His memory was even worse than Zito’s, *244 possibly because he was three years younger than Zito.
Stephens testified that:
• he saw a very pale Alex in the early afternoon, in the front office;
• that afternoon, the in-school suspension work crew of residents were made to run up the hill,[11] except for Alex, who was thought to be “slacking”;
• Alex fell out every couple of minutes, so the direct care staff told them (the other five boys under suspension) to carry Alex up the hill;
• the three boys who tried to carry Alex were dragging his back on the ground, and occasionally let his head “touch” the ground, until the 17staff told them to stop;
• Alex was laid in the hot sun;
• the boys got one water break that afternoon, but Alex didn’t get any water, though one of the boys poured some water on him;
• Alex tried to get into a supervisor’s car, but was refused;
• running as punishment for suspension was common at HYR;
• Alex had never slacked off before, nor had he gotten in any more trouble than the others;[12] and
• the trip up took about 10 minutes, and they worked on the hill for 40 minutes.
4. Dr. Frank Peretti, Forensic Pathologist, testified as to his autopsy of the child’s body. He found cerebral edema (massive swelling) of the brain “typical of head injury patients.”
Page two of Dr. Peretti’s autopsy report contains these surprising and remarkable scientific findings:
Based on the decedent’s body temperature,[13] there is no evidence to suggest that his death was due to hyperther-mia. Vitreous chemistries do not show a dehydration pattern.
Seven months later, after consulting with LSP Detective Allen,[14] the doctor changed the cause of death from “undetermined” to “environmental 18hyperthermia with blunt force head trauma.” At trial, Dr. Peretti was not asked to clarify and explain these apparently inconsistent findings.
The pathologist found bruises and scrapes over much of the child’s body. In particular, he found three bruises on the brain, consistent with being kicked or dropped. Dr. Paretti noted that if a person observed a child vomiting only, the observer would not be able to know of the child’s medical danger, since most people *245 wouldn’t recognize the early stages of heat stroke. He further noted that a medically trained person should have realized the dire nature of a child’s health, if presented with knowledge of strenuous working and running in the heat, vomiting,[15] cramps, and listlessness. He pointed out that hy-perthermia can come about suddenly, or in stages, and that advanced stages could reflect lethargy and sweating.
5. George Hardaway, HYR Ranch Manager, had worked there for six months as of September 13, 2005. He had seen several heat-related incidents at HYR. Shortly after 3:00 p.m. that day, he saw a wet and dirty Alex lying face-down on the asphalt parking lot of the HYR office. The child looked waxy, greenish-pale, and lifeless. There was a large crowd in the parking lot, including residents, direct care staff, and supervisors.
At that time, Hardaway heard Brian Crow, HYR’s Direct Care Staff Program Manager, remark: “He’s faking; he does it all the time.” Crow then picked up Alex by the waistband and chest, and moved the limp body to a golf cart in the shade. Alex could not hold his head up, stand, walk, or lasit up. Hardaway then saw the facility nurse come out, say something to Alex, go back inside, then return to conduct CPR on the boy.
6. Kelly Cash, LPN, HYR Director of Nursing, regularly conducted first-aid training at HYR. That morning, she had taught a medical attendant’s class from 10:00 a.m. until noon.
She saw Alex and the others in the work detail at 2:00 p.m., on the HYR parking lot, immediately before they started walking back up the hill. Alex called out for help about his cramps. She kept walking, advising him to drink water and to call her if the cramps got worse. As she did not think that Alex was in distress, she did not follow her nursing training mantra to “talk, touch, feel, look, and listen.” An hour later, another employee told her that Alex was laid out on the parking lot.
7.Det. Michael Allen, LSP Detective, was called early in the trial to identify a series of photos of HYR, each being admitted into evidence.
Recalled as the state’s last witness, Det. Allen primarily recounted his interviews with the three defendants. Concerning where Alex was laid during the afternoon work session, all three defendants told Allen that the boy was placed in the shade under a tree. Only the two juveniles who testified told him Alex was left in the sun.[16] The trial court believed the boys.
Other salient points from his investigation included that:
• all or most of the supervisors were present at lunchtime;
• another HYR supervisor noticed at lunch that Alex was pale and had trouble standing and told his supervisor (unnamed at |10trial) of the boy’s distress, but the record does not reflect that any action was taken by that supervisor’s supervisor; and
• defendant Combs, who had just been given a ride down from the hill by Doyles, still had the mindset that Alex was merely malingering, as reflected by his telling his supervisor at 2:45 *246 p.m. that “Alex wasn’t wanting to work or do anything.”
8. Ray Martinez, Founder of HYR, spoke briefly about the history of HYR, and the strain the facility was under due to the influx of South Louisiana juveniles post-Katrina. He confirmed that direct care staff should notify supervisors when observing medical problems with the children. Though the supervisors were primarily responsible for contacting the facility nurse, everyone was charged with the responsibility of caring for the kids, particularly in emergency situations. He testified that Alex often complained of illnesses in order to get out of work and other punishment.
IV. APPLICABLE LAW
On the day Alex died, these statutes were in effect, in pertinent part:
• La. R.S. 14:32 Negligent homicide
A. Negligent homicide is the killing of a human being by criminal negligence.
• La. R.S. 14:12 Criminal negligence
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
• La. R.S. 14:93 Cruelty to Juveniles ■ Cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child.
InV. FOUR TIME FRAMES
A. The Morning of September 13, 2005 (9:00 a.m. — 12 noon)
Two morning direct care staff members were in charge of working the in-school suspension kids that morning. Their job was to supervise the five or six suspended juveniles as they performed manual work projects as punishment for infractions such as not behaving in class. The two men put the young people through a strenuous workout, including running[17] up a hill, mowing the grass, working in the barn, and then running punitive laps because of the refusal (or, as we now know, the inability) of Alex to work. The young man was falling and crying, complaining of exhaustion and pain in his leg. Perversely, one of the staff members at the scene made it clear to the other boys that the extra laps (“running the pipeline” in common HYR slang) were on account of Alex’s inac-tions.[18]
*247 It is therefore not surprising that the other boys, all by definition with behavioral problems themselves, took opportunities that morning, as they made their laps, to shove and taunt the prostrate Alex. They denied him water that morning, even as two staff members stood by, not intervening. |12After over two hours of this exhausting regimen, the boys, including Alex, were jogged back down the hill to the cafeteria.
B. Lunchtime (12:00 noon — 2:00 p.m.)
By this time, Alex had problems standing. He was hallucinating, fainting, and calling out strange names. Again he was denied water by the other boys. One of the juveniles testified that all of the supervisors were in the cafeteria during lunch. The inescapable conclusion is that someone should have intervened, since anyone should have been able to see and hear the distress of the child.
One supervisor present at lunch was Tasha Jackson, who:
• kicked Alex;
• ordered another employee to pull Alex away from where he was putting his head under the hand-washing faucets at the lunch room;
• jerked Alex off the floor;
• slammed him against the cafeteria wall; then
• took the 100-pound child out of the cafeteria for a few minutes. The record is silent as to what happened during that time.
At 2:00 p.m. on this hot September day, the boys were lined up in the parking lot, within feet of the HYR office and the HYR cafeteria, preparatory to the afternoon work detail. Alex spotted the facility nurse, Kelly Cash, LPN, about 30 yards away. He called out for help with his cramps. She never checked him. Instead, she kept on walking, advising him to drink plenty of water, and to call her if the problem continued. Nurse Cash knew that the boys had been working outside that morning. The boys then started walking up the hill in the blistering heat of the day.
113C. The Afternoon Work Detail (2:00 — 3:00 p.m.)
Greenard and Combs checked in for work timely at 2:00 p.m. Henderson was late. They were to supervise the boys during the afternoon work detail. All that Greenard and Combs were told about the morning was that Alex was trying to get out of work yet again. Nothing was told to them about his various physical symptoms and complaints that morning (crying, falling, pain), or about the extent of the abusive physical exertion he (and others) had undergone. They followed close behind the crew, in the comfort of an air-conditioned motor vehicle.
The record preponderates that at no time on this date did any of these three defendants make the boys run; nor did they ever kick or strike Alex.[19]
After walking about four-tenths of a mile, Alex started complaining again. He lagged behind and began to fall down. Greenard and Combs told the boys to help him up the hill. The boys roughly dragged him on the ground for about a tenth of a mile, causing abrasions and contusions. One of the boys kicked him in the head. They struck him numerous times, the bruises being visible on the autopsy *248 photographs. The boys soon tired of dragging him, so one of the boys put Alex on his back, continuing the trudge for another tenth of a mile, until Alex vomited on him, at which point he dropped Alex on his back and head. Greenard and Combs then allowed the boy to ride with them the last two-tenths of a mile.
At the time, HYR had no written policy regarding:
|14* running as punishment;
• mandatory water breaks in hot weather; or
• mandated responses to vomiting.[20]
At the summit, the other boys continued mowing while Alex lay on the ground. Greenard and Combs insisted to Det. Allen that they laid him in the shade under a tree. Henderson also confirmed to Det. Allen that Alex was in the shade when he got there at 2:36 p.m. In contrast, the two juveniles testified at trial that Alex lay motionless in the hot sun, one of the very few facts about which the juvenile witnesses were clear and consistent. One of the boys even testified that the others mowed around Alex. On the strength of the testimony of the two juveniles, the trial court made the factual finding that Gree-nard and Combs left the child in the hot sun during the work detail.
At least four of the other five boys on the afternoon work crew would not allow Alex to drink at the water break. There is some testimony that one child poured water on Alex, or briefly and unsuccessfully tried to get him to drink as he lay on the ground.
11fiShift supervisor Willis Doyles gave the tardy Henderson a ride up the hill, arriving at 2:36 p.m. She would have observed the location of the child (sun or shade) at the scene, but did not testify. Upon her arrival, Greenard indicated that Alex was faking and/or wouldn’t work. She poured water on him and locked her vehicle, refusing to take him down the hill, essentially sealing his fate. She started back with Combs at 2:40 p.m. so he could get gasoline for the lawn mower.
Accordingly, the interaction of Combs and the victim ended then. When he arrived at the office about 2:45 p.m., Combs still thought Alex was faking, as reflected by his comment to his supervisor.
Shortly after Henderson arrived on the hill, he checked the child’s pulse.
On this date, none of these three defendants had responsibility for Alex before 2:00 p.m., at the earliest, or after 3:00 p.m., at the latest. In fact, this record reflects that each of these defendants spent the following very approximate amounts of time with Alex Harris on this date:
*249 • Greenard, age 26 (a nine-month HYR employee), spent 60 minutes with Alex, from 2:00 until 3:00 p.m.;
• Combs, 38 (slightly more than a 12-month HYR employee), spent 40 minutes with him, from 2:00 until 2:40 p.m.;
• Henderson, age 23 (a two-year HYR employee), spent 20 minutes with Alex, from 2:40 until 3:00 p.m.
All three men had received 15 minutes’ training per year on the recognition of signs of illness. For Greenard that meant a total of 15 minutes; for Henderson and Combs, that meant a total of 30 minutes. The paperwork as to training looked fine; the reality was far less satisfactory.
| ^Títere were no thermometers at the work site.
Direct care staff were not permitted to have personal cell phones with them when working the boys. Unfortunately, the HYR internal communication phones[21] were inoperative on this date. To have secured assistance, one of the direct care staff would have had to travel physically to the office. None did so.
At 2:58 p.m., Greenard and Henderson told the work crew to head back down the hill. The vehicle, with Alex in the back, was driven without urgency, traveling at the speed that the others could walk. Greenard told him during the ride to “quit faking it.” Alex had problems breathing and “seemed out of it.” Henderson checked his pulse again on the way down.[22]
D. After the Work Detail (Post 3:00 p.m.)
At 3:00 p.m., Greenard and Henderson inexplicably laid Alex face-down on the asphalt parking lot, on a day with a heat index of 103 degrees. When Henderson and Greenard left the child where they did, they were criminally negligent, and the child suffered from this thoughtless act.
The child at this point was waxy, motionless, and unresponsive, apparently in the agonal moments of death. One supervisor tried ammonia sticks, to no avail, but thought he detected a carotid pulse. Nurse Cash could not find a pulse. Alex was moved out of the sun. Cash told others to | |7call 9-1-1 while she administered CPR, but it was too late.[23] The child never responded to CPR administered by Nurse Cash nor to the lifesaving techniques utilized by the responding EMTs.
We have assembled this chronology from the Webster Parish Coroner’s Report (Joint Exhibit # 1), and the Complaint Report from 9-1-1 (Joint Exhibit # 2):
• 3:18 p.m. 9-1-1 call received.
• 3:19 p.m. Ambulance dispatched.
• 3:33 p.m. Ambulance arrived at HYR; EMTs worked on Alex but could detect no vital signs.
• 4:05 p.m. Ambulance left for hospital, no signs of life.
• 4:17 p.m. Ambulance arrived at Minden Medical Center.
• 4:18 p.m. Patient wheeled into the Emergency Room with CPR in prog *250 ress, the body being in full rigor, with much lividity.
• 4:20 p.m. No vital signs, body temperature of 95 degrees.
• 4:24 p.m. Code canceled; patient expired.
The forensic pathologist’s theory that a child’s body would lose about one degree of temperature per hour for the first few hours after death is skewed by the proven facts of this case.[24]
VI. DISPOSITION AND REASONING
Greenard, Combs, and Henderson, though only minimally trained, should have done much more to help Alex Harris that day. Their actions and inactions, however, didn’t kill the boy. For this young man to die required a perfect storm of inattentive and uncaring HYR personnel, up and 1 tfjdown the chain of command. The bottom line is that the inexorable descent toward death was well in place before these three men ever reported to work.
Notwithstanding the forensic pathologist’s unscientific final conclusion, we find that this record is ambiguous and contradictory as to the precise cause of death. Consequently, this record is insufficient to prove beyond a reasonable doubt that the defendants were guilty of negligent homicide. We accordingly vacate the negligent homicide convictions and acquit each of them on those charges.
Culpability for this tragedy can arguably be imputed to these persons:
• the other juveniles on the two work details that day, who made the child’s last hours a living hell by battering him, dragging him, taunting him, kicking him in the head, refusing to allow him to drink, and dropping him on the ground;
• the two direct care staff members who ran him that morning far beyond his limits, and who set him up to be physically and emotionally abused and denied water by the other children;
• the several supervisors and staff members at lunch who looked the other way as Alex was slumping to the floor, delirious, calling out to unknown people, and again being denied water by the other boys;
• the supervisor who ordered a staff member to remove Alex from the hand-washing area, where he was putting his head under the water;
• the same supervisor who kicked Alex, slammed him against the wall, and took the 100-pound boy outside for some unknown reason;
• the facility nurse who wouldn’t take 15-20 steps to check on a boy who was complaining of cramps shortly before 2:00 p.m. on a blistering hot day, when she knew that the boys had been working outside that morning;
• the administration and management of this facility, who neglected to implement and follow through on safeguards to protect the physical health and safety of their residents; and
|19* in particular, the policymakers who allowed “group motivation” and “running the pipeline” to become the norm at HYR.
The fact that we perceive others also to be grievously at fault does not excuse the actions or inactions of these defendants. Our review is limited to the culpability of these three men who were actually prosecuted. Our focus is narrowly drawn as to what they did and didn’t do, during their respective minutes of supervision of the *251 decedent, during an overall one hour time period from 2:00 until 3:00 p.m. on this terrible day.
The state stipulated that these men did not intend to harm the child. That being so, the only way to prove cruelty to juveniles was by showing that these men acted with criminal negligence. The state has done so.
The clearest acts of criminal negligence, leading to a finding of cruelty to juveniles would certainly include, inter alia:
• Greenard and Combs letting the boys hit and drag him up the hill;
• Greenard and Combs leaving him in the sun[25] on the hill for the better part of an hour, as the trial court specifically found;
• all three men being unresponsive to the child’s physical problems during portions of this hour, failing to make certain he had water, and then failing to timely seek medical assistance; and
• Greenard and Henderson laying the child face-down on the hot asphalt when the afternoon work session ended.
Greenard is most clearly guilty of the three, simply because he was the only one who was with Alex at all relevant times during the afternoon work hour. Next would be Combs, who left toward the end of the work hour with Doyles. Least culpable would be Henderson, who had been tardy in arriving at work, not arriving up on the hill until 2:36 p.m., meaning he | gpspent the least time with Alex that day.
But all three are guilty of cruelty to juveniles.
There is not a good way to die, but Alex suffered unnecessarily during his final moments, and for that these three defendants are criminally responsible. Greenard, Combs, and Henderson were criminally negligent in their treatment of the juvenile on September 13, 2005, causing Alex to withstand additional pain and suffering.
Thoroughly reviewing this record, we cannot say that the trial court was clearly wrong in its factual and legal conclusions in finding these men guilty of cruelty to juveniles. Accordingly, we remand each case for individualized resentencing on the one charge.

DECREE

Convictions for negligent homicide are REVERSED AND VACATED; convictions for cruelty to juveniles are AFFIRMED; and the matters are REMANDED for resentencing.
CARAWAY, J., concurs with written reasons.

. These prosecutions easily satisfy the clear requirements of Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 70 L.Ed. 306 (1932), as each crime has at least one distinct element not required by the other (negligent homicide requires a death; cruelty to juveniles contains age requirements). The two charges would also appear to pass muster with Louisiana's less clear "same evidence” test for jeopardy, though with our insufficiency finding on the negligent homicide charge, we do not reach that issue.

. When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529. This same deference applies when the case is tried before a judge. State v. Bowie, 43,374 (La.App.2d Cir.9/24/08), 997 So.2d 36, writ denied, 2008-2639 (La.5/22/09), 9 So.3d 141.

. Alex complained often of symptoms without any known medical disorders being found, and he often used alleged illnesses to get out of work. The child had earned a negative work record at HYR, creating a mindset such that the residents, direct care staff, and supervisors gave little or no credence to his continuing physical complaints.

. The child was apparently born in October of 1992, making him 12 years old at the time of his death. Often in court he was described as being 11 years old.

. The cause of death was initially categorized as “undetermined.”

. Essentially a more severe and escalated progression of heat stroke.

. The two against whom charges were first dismissed were Jeremy Blanks, who assisted in running and working the child that morning, and who dragged Alex away from a water source (upon direction of Tasha Jackson) during the noon hour; and Troy Hamilton, whose activities that day are unclear from this record, other than his being present in the cafeteria during the noon hour, when Alex was delusional and apparently manifesting advanced signs of heat stroke.

. Dismissed on the day of trial: Marcus Jones, who physically hazed the child that morning. He required punitive laps to be run (an event so common that HYR had developed its own vernacular — "running the pipeline”). He allowed the other boys to deny Alex water, which triggered the child's inexorable descent into heat stroke, injury, and death; Tasha Jackson, who at lunch, in the presence of numerous staff members, ordered Jeremy Blanks to prevent Alex from seeking water from the hand-washing area, and who slammed the child against the wall of the cafeteria and kicked the child; and Willis Jean Doyles, a supervisor who first took Henderson to the work site at 2:36 p.m., and, in response to the child's pleas for help, threw water on him and refused to let him in her vehicle at 2:40 p.m. as she drove back down the hill.

. Example of Haynes' facile responses:
Q. Was the no running policy communicated to the three men?
A. I can say we have a limitation to punishment policy.

. A hilly 200-yard circuit.

. This is undoubtedly a mistake — all other testimony indicates that the kids walked up the hill that fateful afternoon.

. This testimony is in stark contrast to all other testimony about Alex and his negative work habits and stunted social relationships at HYR.

. The decedent’s body, when presented at the Minden Medical Center’s Emergency Room about 4:20 p.m., was in full rigor with pronounced lividity and a temperature of 95 degrees, indicating to Dr. Peretti that if the child had a 98 degree temperature at the moment of death, the time of death would have been 1:20 p.m. at the latest (one degree loss per hour for the first few hours after the child's death). Environmental hyperthermia and a swollen brain would seem to indicate that his temperature at the moment of death would have been higher than normal, rather than lower, making the time of death even earlier. At any rate, testimony established that the child was clearly alive, begging for help and somewhat ambulatory as late as at 2:40 p.m.

.Det. Michael Allen took statements from many witnesses, including the defendants.

. The record bears two oblique references to Alex vomiting that morning, which was not confirmed by the boys who were there. All who testified, however, agreed that Alex vomited in the afternoon. At any rate, at 2:00 p.m. that day, neither the nurse nor these three defendants had any information about Alex vomiting earlier in the day.

. Doyles, who would have seen where the boy was placed, did not testify.

. In September of 2005, running as punishment was a very common activity, according to one of the juveniles. Though conceded in the state's brief, this point was disputed by some of the HYR personnel.

. This "group motivation” philosophy raises its head twice in Detective Allen's testimony about statements taken from two of the defendants. It is also tangentially found on Page 14 (Rules 3-5) of Joint Exhibit 3, the Hope Youth Ranch Resident Handbook relative to keeping a residential area (“the bunkhouse") clean. The implication in the document is that if a resident won’t do his part, possibly the group can motivate him. This would suggest that at times the kids did the enforcing of rules, leading to potential for unrestrained cruelty and tragedy. See Lord of the Flies, William Golding, 1954: "Maybe there is a beast ... maybe it’s only us.”
The Hope Youth Resident Handbook, is not as helpful as it could have been, since only 16 of the first 30 pages were placed into the record — apparently only one side of each page was photocopied, from a two-sided document. There are no odd-numbered pages.

. The boys were indeed punitively run in the hot sun that day, but that occurred during the morning, under the direction of Jones and Blanks, before these defendants arrived for work.

. Since the death of Alex Harris, HYR has added these six precepts to its in-school suspension policy and procedures:
• All in-school suspension activities will be held within the view of the HYR Administrative offices, so HYR administrative staff can monitor activities.
• All Residents will walk to and from all work details, no running.
• A 10 minute water break will be held for every 50 minutes of work. Each Resident/Student will be allowed all the water they can drink during the 10 minute break.
• Employees who monitor in-school suspension should monitor the Residents/Students for any heat related problems.
• If a Resident/Student complains of heat exhaustion or seems to be over heated, the facility nurse should be notified immediately, and evaluate the Resident/Students condition.
• During the summer months and during extreme heat, water breaks and cool down breaks should be given more often.

. Designed for usage by direct care staff in emergency situations.

. Though several people took the boy’s pulse this day, the only quantitative readings contained in the record are the zeros found at HYR by EMT ambulance personnel, and the zeros found by staff at the emergency room.

.George Hardaway testified that Cash went inside and came back, before implementing CPR. Nurse Cash testified that, during CPR, the child vomited and "everything just stopped."

. Consider: The body temperature at 4:20 p.m. was 95 degrees; the walk up the hill began at 2:00 p.m.; Alex stood and begged to get into the Doyles vehicle at 2:40 p.m.

. A fact disputed by all three defendants, in statements to LSP Detective Allen.