GRAVOIS, J.
*1211 Defendant, Victor L. Becnel, appeals his convictions and sentences for negligent homicide, a violation of La. R.S. 14:32(A)(1) (count one), and intimidation of a witness, a violation of La. R.S. 14:129.1 (count two). Defendant was sentenced to five years at hard labor on count one and eight years at hard labor on count two. On appeal, defendant argues that the trial court erred in denying his motion for a new trial and/or motion for post-verdict judgment of acquittal because the evidence was insufficient to support the jury's verdicts. Defendant also argues that his sentences are excessive.
For the following reasons, we affirm defendant's convictions and sentences. The matter is remanded with instructions to correct the commitment as noted below.
PROCEDURAL HISTORY
On October 29, 2015, a Jefferson Parish Grand Jury indicted defendant, Victor L. Becnel, with the second degree murder of three-year-old P.S[1] (D.O.B. 2/13/12), in violation of La. R.S. 14:30.1 (count one), and with injuring or attempting to injure a witness in her person or property with the intent to influence testimony, reporting of criminal conduct, or appearance at a judicial proceeding, in violation of La. R.S. 14:129.1 (count two). Defendant pleaded not guilty at his arraignment on October 30, 2015.
Defendant proceeded to trial before a twelve-person jury on January 23, 2017. On January 31, 2017, the jury found defendant guilty of the lesser included offense of negligent homicide, a violation of La. R.S. 14:32(A)(1) on count one, and guilty as charged on count two.
On March 15, 2017, the trial court denied defendant's post-verdict judgment of acquittal and motion for a new trial. After a waiver of delays, the trial court sentenced defendant on count one to five years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence, and on count two to eight years imprisonment at hard labor. The trial court further ordered defendant's sentences to run concurrently with each other. On March 23, 2017, defendant filed a motion to reconsider sentence and a motion for an appeal. The trial court granted defendant's motion for an appeal on the date of its filing (March 23, 2017) and denied defendant's motion to reconsider sentence on March 24, 2017.[2] Defendant now appeals, challenging the sufficiency of the evidence used to convict him of negligent homicide and intimidation of a witness and the alleged excessiveness of his sentences.
FACTS
Firemen Adam Dequeant, Larry Amedio, and Larry Frederick of the Live Oak Manor Fire Department responded to a call of a nonresponsive child around 3:45 p.m. on March 18, 2015, at 628 Oleander Street, Westwego, Louisiana. Upon entry into the house, Dequeant heard defendant, Victor Becnel,[3] yelling "we're back here,"
*1212 from the master bathroom. In the master bathroom, Dequeant observed the three-year-old victim, P.S., lying on his back with a towel underneath his head[4] while defendant leaned over him repeatedly stating, "Don't do this to me. Come on, [P.S.]." Dequeant and Amedio carried P.S. into the master bedroom where CPR was performed while awaiting the arrival of EMS personnel; however, they were never able to obtain a pulse.[5] Prior to departing for the hospital, P.S.'s mother, Nelly Pena, arrived and was transported with P.S. in the ambulance to West Jefferson Hospital where P.S. was pronounced dead at 4:46 p.m.
While standing outside of the family waiting area, Fireman Frederick observed that when the family was informed of P.S.'s death, defendant became irate, threw his cell phone, and was asked to remain calm by hospital security as he was frightening others around him.
Dr. Brian Dehart, Emergency Room physician at West Jefferson Hospital, testified that P.S. arrived at the hospital with no vital signs and was cold to the touch. He made resuscitation efforts to no avail, and P.S. was pronounced dead. Dr. Dehart recalled notifying P.S.'s family of his passing and found it "unsettling" that upon delivering the news, defendant threw things around the room and punched the wall.
Detective Grant Holley of the Jefferson Parish Sheriff's Office testified that he responded to the call regarding an unresponsive child on March 18, 2015, and that upon his arrival, P.S. was being loaded into the ambulance. Detective Holley spoke to defendant, who advised him that he had picked up P.S. from his mother at her place of employment earlier that day because she had informed him that he was sick. He said that P.S. had been sick for the past two weeks. Defendant further stated that when they arrived home, P.S. put his head down on the kitchen table, fell out of his chair, and was unresponsive, prompting defendant to call 9-1-1. Detective Holley testified that defendant appeared extremely worried but very coherent and clear in his explanation of what had transpired. Detective Holley testified that defendant's demeanor changed at the hospital when he was informed of P.S.'s death, describing his demeanor as aggressive and hostile-punching walls and throwing his cell phone-before being escorted out by security. After a cursory examination of P.S., Detective Holley observed no external signs of "foul play."
After being escorted from the hospital, defendant was picked up by his friend, Deputy Ted Raymond of the Jefferson Parish Sheriff's Office. Defendant told Deputy Raymond that "he heard a noise when he got home. He sat the boy ... down at the table with the Big Gulp. He heard a noise from the bathroom, sound like something fell." He said that P.S. was sick so he was taken to the hospital. Defendant further told Deputy Raymond that he had gotten into a fight with P.S.'s grandfather at the hospital and left. Deputy Raymond convinced defendant to return to the hospital where, upon their arrival, the police were looking for him.
Detective Melvin Francis participated in the investigation of the death of P.S. At *1213 the hospital, Detective Francis observed P.S. and noted two small contusions on his forehead. Detective Francis, who spoke with defendant when he returned to the hospital, described defendant's behavior as dismissive, noting that he referred to P.S. as "the child" and not by his name and did not seem "caring." Defendant advised Detective Francis that he received a call from P.S.'s mother requesting that he pick him up from her place of employment because he was sick. He told Detective Francis that after he picked him up and brought him home, he heard a noise in the kitchen and discovered that P.S. was unresponsive. Defendant further told Detective Francis that he carried P.S. to the bathroom and attempted to revive him before calling 9-1-1. Detective Francis again met with defendant a few days later, on March 20, 2015, after defendant inquired about the details of P.S.'s autopsy.
P.S.'s mother, Nelly Pena, testified that she shared custody of P.S. with his father, Delmus Stewart. She testified that after separating from Delmus she began living with defendant when P.S. was four months old.[6]
Ms. Pena testified that on or about March 12, 2015, P.S. had not eaten well at dinner and woke up in the middle of the night having vomited in his sleep. P.S. slept all day the next day and was unable to hold down food or water. Ms. Pena dropped P.S. off at her mother's house that evening, March 13, 2015, because she had to work the next day. On Saturday, March 14, 2015, Ms. Pena's mother reported to her that P.S. was still sick and not eating, but was able to drink coconut water. According to Ms. Pena, the next day, Sunday, March 15, 2015, P.S. had a fever when she exchanged custody of P.S. with Delmus. Ms. Pena reported that the following evening, Monday, March 16, 2015, Delmus brought P.S. to an urgent care facility where he was prescribed medication and sent home. P.S. was back in Ms. Pena's custody by Tuesday evening, March 17, 2015, and according to Ms. Pena, was still running fever and only eating yogurt. The following day, March 18, 2015, Ms. Pena brought P.S. to visit his great-grandmother before bringing him to work with her at NOLA Motor Sports, since he was still sick and unable to attend school. Ms. Pena then texted defendant and requested that he pick P.S. up from her and asked that defendant try and feed P.S., believing he was likely hungry.
Defendant picked P.S. up from Ms. Pena around 2:15 p.m., and the next thing Ms. Pena recalled was receiving a phone call from defendant informing her that P.S. had stopped breathing and that she needed to come home. When Ms. Pena arrived at her house, she was transported with P.S. in the ambulance to West Jefferson Hospital where P.S. was pronounced dead at 4:46 p.m.
Approximately two weeks later, on April 2, 2015, defendant and Ms. Pena were asked to go the police station where they were questioned about the days leading up to P.S.'s death. During Ms. Pena's interview, she told Sergeant Tommy Gai that she and defendant argued about disciplining P.S., saying that defendant would often tell Ms. Pena that she was "too soft" on P.S. Ms. Pena further told Sergeant Gai that defendant would "do a lot of yelling ... spank him a couple times when he was trying to blow his nose he would um, [P.S.] didn't like it getting his nose blown and Vic [defendant] hated that he didn't like it and he would kind of um, grab him, shake him sometimes um, he would swing him *1214 like [P.S.] listen." She said that she would tell defendant that he was too hard on P.S. and remind him that P.S. was just a baby, to which defendant would tell her "to get out and let me deal with him that's why he's soft." Ms. Pena further stated, "I think he just goes overboard he's just a baby." Ms. Pena told Sergeant Gai that she believed defendant was "just being strict" because of his upbringing and that even when he would "maybe hit him to [sic] hard he would feel bad ... I don't think he realized if he did hurt him that hard." According to Ms. Pena, defendant had a quick temper and when asked whether she believed defendant could have hurt P.S., even if by accident, Ms. Pena replied, "he is strong enough he-he can get angry enough but I don't think he would do it on purpose. I think if he did discipline him he probably went too far seen red." Ms. Pena said that defendant was a good father but was too strict and "just so mean." At trial, Ms. Pena confirmed that P.S.'s daycare had contacted her on a number of occasions regarding various marks that were observed on P.S., including a black eye and a bruise on his face.[7]
In a second statement provided a few hours after her first, Ms. Pena recounted the abuse she suffered at the hands of defendant. She told Sergeant Gai that when defendant became upset, he would choke and throw her onto the ground. She further recalled that such instances of abuse happened both while she was pregnant as well as afterwards. On one occasion, defendant also threw her head against a wall. She said that she did not call the police because she had forgiven him and did not believe he meant it, he having told her that he would not do it again. Ms. Pena stated that despite his promises, the physical abuse still occurred, and she confirmed that she was scared of defendant, expressing her desire to pursue criminal charges.
At trial, Ms. Pena stated that she was intimidated into saying the things she said in her first statement, asserting that they were all untrue.[8] Ms. Pena further denied the truthfulness of her second statement to the police regarding defendant's abuse committed upon her, including four separate occasions when defendant strangled her, once while she was pregnant, and a time when defendant pushed her head into a wall.[9]
Ms. Pena identified a recorded conversation between herself and defendant while defendant was in jail on August 10, 2016, during which she discussed with defendant her testimony for a court hearing scheduled for the following day. On the recording, defendant is heard telling Ms. Pena, "the only thing I'm worried about you is that you're not quick.... you already know what to do, just let it flow ... you have been practicing this for a long time."
After the court hearing on August 12, 2016, a second conversation was recorded *1215 between Ms. Pena and defendant during which Ms. Pena and defendant utilized code words and during which Ms. Pena admonished defendant to be careful of what he said on the phone. Specifically, during the phone call, Ms. Pena asked defendant "how did it go," to which defendant replied, "I should be asking you." Ms. Pena said "I was there," but, "I could have damaged myself by saying something." Defendant then stated, "the one thing I want you to remember, if you were threatened, coerced or forced, how can it come back to you?", to which Ms. Pena replied, "because I said it was all made up." Defendant instructed Ms. Pena that she "cannot protect the police." Ms. Pena then began to cry, explaining that she "blamed" herself, prompting defendant to state "don't take this the wrong way ... I'm just trying to tell you the strategy that everyone uses on you. Everyone can tell right off the bat that you're weak.... I've known this about you for a long time, but this is the thing, you don't always have to be that way baby.... all you have to do is calm yourself down ... have you talked to him about every encounter you've had with those people where you were threatened?", to which Ms. Pena replied, "we already talked about this ... you've got to watch what you say." Defendant said to Ms. Pena, "you know why they aren't going to let it go? We're the worst Parish in the State and the worst County in America. Jefferson Parish trumps up charges so high, ridiculously high, and then if they know there's a weak case ... they drop it down to make it seem like it's ok. Another thing they do is intimidate people. There is nothing to stop police from intimidating people ... you just weren't prepared." Defendant then reminded Ms. Pena, "they are not the good guys," that she is "a little too trusting," and that "nothing vital has been said."
Ms. Pena testified that while defendant was incarcerated, she became pregnant by another man and gave birth to a son named Francisco. Ms. Pena discussed over the phone with defendant her future with him given the birth of her new child. During their discussion, defendant stated: "if I have to pick between you and that baby ... f**k that baby ... not even that little brat you just pushed out will keep me away from you, unless you want me away from you." Defendant then told Ms. Pena how much worse life would be without him there to protect her, reminding her how her family controls her: "I took you out of that little girl place that you were in and put you in a women's place and I gave you control back. They [Ms. Pena's family] don't like that.... They didn't have control when I was there because I was extreme." Defendant then encouraged Ms. Pena to obtain a restraining order against Francisco's father, later stating, "he knew you were weak ... they laugh at you."
Defendant's friend, Walter Jenkins, testified that he was charged as a co-defendant in this case with intimidation of a witness and pled guilty to a reduced charge of failure to report a felony. He testified that after P.S.'s death and defendant's arrest, he spoke with defendant while defendant was incarcerated. During their conversations, Jenkins recalled defendant encouraging him to tell Ms. Pena "to be quiet what she was saying about him." At defendant's request, Jenkins took time off from work and relocated from New Mexico to New Orleans.
In a recorded jail phone call on the morning following defendant's arrest, April 3, 2015, Jenkins told defendant that Ms. Pena had informed the police that defendant had previously choked her and "threw her on the couch." Jenkins stated that he had "explained to her the severity of saying something like that.... Her saying that did not help your case." He also told defendant that Ms. Pena had informed the *1216 police that "you shook [P.S.] before," to which defendant responded, "I'm done." Later, Jenkins told defendant "I know how rough you play with the boys because you're just a rough person," explaining, "they're trying to label you as abusive." Defendant asked Jenkins whether he had been in contact with Ms. Pena, to which Jenkins responded, "I talked to Nelly [Ms. Pena] earlier today. I ain't talked to her again. You need me to relay something to her?" Defendant then stated, "tell her to keep her mouth shut," prompting Jenkins to reply, "alright, I'll let her know cause I told her she already did enough damage," to which defendant stated, "exactly."
In another recorded jail phone conversation made later that afternoon on April 3, 2015, Jenkins told defendant that he needed to stay as calm as possible because they were depicting him as a "violent crazy dude." Jenkins believed "in the back of Nelly's [Ms. Pena's] head, she think you did it, ... they probably told her that what happened to him is from long term abuse. And in Nelly's head, she like the only person that's rough with her son is you when y'all playin' and s**t ... that's the only way in my mother f**kin' mind that someone would say some dumb s**t like she told them," adding, "in my head she is too weak." Jenkins also told defendant that Ms. Pena said "y'all would get into it about the way you treated [P.S.]. She told them that sometimes she didn't want to leave [P.S.] with you because you was too rough with him. So you tell me what picture that paints?" Before ending their conversation, Jenkins stated, "that old n***er that you used to be, is probably going to come back to haunt you right now," prompting defendant to respond, "I always knew he would."
The following day, April 4, 2015 at 7:22 a.m., in another recorded jail phone conversation, Jenkins told defendant that the case is "all depending on Nelly's testimony," to which defendant stated, "I need them lawyers to discredit that," and Jenkins replied, "yeah, they gonna have to attack her bro, cause she f**king retarded." Defendant told Jenkins, "if it comes down to testimonies and all that s**t, I definitely need her [Ms. Pena] for that." Jenkins responded, "I really don't know what to do with her bra [sic]. I wanna talk to her but I'm hot." Defendant then told Jenkins, "try not to give her a 10. Give her a 5, but try not to give her a 10," prompting Jenkins to reply, "I'll do it ... I'm gonna give her a 3, but I won't give her a f***ing 15." Jenkins testified at trial that the numbers discussed in this telephone call were references to power levels on a video game, and indicative of the "amount of force" he was to use on Ms. Pena, with the number four being as stern as possible "to get her to shut up."
Later that same day, defendant told Jenkins over the phone, "make sure that that person [Ms. Pena] know that testimony is everything." Jenkins confirmed, "yea, I know. We got it, don't worry about that." Defendant then said, "I know you probably gonna ride your car around to talk about it so if you want to just put your car in my garage and use my truck," prompting Jenkins to respond, "man I got all that taken care of bro don't worry about it." Defendant then told Jenkins to ask his (defendant's) father to call "the detective" to find out where the "big change" in the case came from because "the original detective" on the case said "everything was good," to which Jenkins stated "probably came from the D.A.'s." Defendant then told Jenkins he did not think it came from the D.A. but rather "from somebody opening their mouth. The police picked up on that and that's how that whole thing played out. Remember what I told you, don't let her out your sight." Defendant later told Jenkins, "[a]ccess level 3 granted, go to 5 if you need to, but make sure you keep her *1217 on my side. Test her loyalty every which way you can.... When you get a chance, get her in the car and go take a ride. A long ride wherever." Jenkins responded, "alright, we gonna talk bra [sic] and see what's going on."
Jenkins testified at trial that he did not end up using the level of force he discussed with defendant on Ms. Pena. He further testified that while he spoke with Ms. Pena after his conversation with defendant to find out why she had said the things she did, which caused defendant to be arrested, he never spoke to her about dropping the charges. He did, however, confirm that he told Ms. Pena "that her statements were hurting" defendant and that she agreed to help him on her own.[10] At trial Jenkins characterized defendant's personality as "kind of controlling."
While Jenkins was meeting with Ms. Pena on the evening of April 4, 2015, defendant called Jenkins, who was at Ms. Pena's house. Defendant asked to speak with Ms. Pena, and Jenkins responded, "everything's good with that." After defendant spoke with Ms. Pena, Jenkins got back on the phone and was instructed by defendant to "take a quick walk and get by yourself." Defendant then questioned Jenkins, "what do you think?", to which Jenkins responded, "she good." Defendant then asked, "100%?", and Jenkins answered, "yea ... she gonna drop all her charges." Defendant later commented, "as long as I got her, nothing else matters," telling Jenkins "good job, good job." Jenkins then stated, "I just told her she gotta watch what she say."
Dr. Rae Taylor, an expert in the field of domestic violence, explained to the jury the various types of domestic violence ranging from physical to psychological. She explained that physical abuse typically begins in the form of minor injuries and eventually escalates in severity. Dr. Taylor noted that it is not uncommon for a victim of domestic violence to stay in a relationship for various reasons, including fear of retaliation or the desire to keep the family unit whole. In her experience, it was common for victims of domestic violence to recant statements previously given about the abuse they have suffered because of their love for their abuser. She further opined that in situations of statement recantation, it is typical to see the victim of domestic violence express a feeling of responsibility and guilt for their abusers' incarceration and/or feel pressured into dropping the charges against them.
Dr. Taylor testified that she reviewed the statements made by Ms. Pena after her son's death, in which Ms. Pena told the officers of the multiple occasions of severe physical abuse she suffered at the hands of defendant and concluded Ms. Pena suffered from domestic abuse. Dr. Taylor noted that in her statement, Ms. Pena told the officers that she did not call the police after these instances of abuse because she was scared of defendant. Dr. Taylor also listened to the jailhouse calls made on July 10, 2015 between defendant and Ms. Pena which involved defendant minimizing, blaming, making an appeal for sympathy, and committing emotional abuse on Ms. Pena. She testified that defendant exhibited his power and control over Ms. Pena by demanding that she repeatedly say that she loved him and by expressing his undying love for her in a coercive and manipulative way. Dr. Taylor testified that another call between defendant and Ms. Pena on April 6, 2016 involving discussions of Ms. Pena's pregnancy by another man, instructing *1218 her on what she should do, and how she appeared weak to others, was, in her opinion, another display of power and control over her.[11] Additionally, Dr. Taylor noted that on July 22, 2016, two days after her child by another man was born, defendant made threats regarding the child's father, calling her weak, all while utilizing a very intimidating tone of voice.
Dr. Susan Garcia, an expert in the field of forensic pathology, performed the autopsy on P.S. Dr. Garcia noted that P.S. presented with a contusion on the right side of his forehead, a scar on his left elbow, and two more small contusions on his lower back. An internal examination of P.S. revealed the presence of a pint of blood in his abdominal cavity and a liver laceration five centimeters in length-which she opined to be the direct result of blunt force trauma to the abdomen.[12] She noted that on the liver were characteristics of recent trauma superimposed on remote trauma, meaning that there was evidence that the liver was in the process of trying to repair itself from a prior injury which was then recently re-injured causing the old injury to bleed acutely and cause P.S.'s death.[13] The internal examination also showed bleeding into P.S.'s diaphragm, the peritoneal wall, some of the tissue near his esophagus, and in the area next to his pancreas, the mesentery (the tissue that holds the small and large bowel in place), and the serosa (the external portion of the bowels), all in the area where the liver was lacerated. Based on her observations, Dr. Garcia believed that there was likely more than a single episode of blunt force trauma which caused P.S.'s liver to lacerate. Dr. Garcia also concluded that P.S.'s forehead contusion was an acute injury due to the presence of recent hemorrhage and lack of inflammatory response. Dr. Garcia listed the cause of death as blunt force trauma to the abdomen, and the manner of death as a homicide.
Because P.S.'s pancreas appeared abnormally large and firm, Dr. Garcia requested a consultation from pediatric pathologist Dr. Bradley Cheek. Dr. Cheek, an expert in the field of pediatric pathology, testified that he provided a consult per Dr. Garcia's request. After examining the pancreas and tissue slides from P.S.'s other organs provided to him by Dr. Garcia, Dr. Cheek concluded that the liver contained reparative fibroplasia calcifications indicative of a remote injury[14] as well as acute hemorrhage and necrosis indicative of a recent injury. Dr. Cheek agreed *1219 with Dr. Garcia and defense expert Dr. Michael Baden that P.S. had sustained an underlying injury to his liver leading up to his death, but further agreed with Dr. Garcia that there was also a superimposed acute event on his liver.
Detective Eddie Klein interviewed defendant on April 2, 2015. During his statement, defendant was asked about discipline in the home. Defendant said that he lets Ms. Pena "deal with it until she wants me to deal with him ... I pop him on his hand. I might have popped him on his butt never excessive." He admitted that he and Ms. Pena would have arguments about P.S., ranging from his picky eating habits to his failure to listen. Defendant said that he came from a "really disciplined house" and that Ms. Pena did not. Defendant further stated that he did not know how P.S. could have sustained a laceration to his liver. During his interview, Detective Klein obtained information from Sergeant Gai, the officer who interviewed Ms. Pena, that there may have been abuse in the home. According to Detective Klein, Ms. Pena provided a very vivid description of the dynamics of her household to Sergeant Gai regarding the abuse she and her son experienced at the hands of defendant.
After the interview, a warrant was issued for defendant's arrest. The warrant, authored by Detective Klein, included information obtained from Sergeant Gai which stated that on the morning of March 18, 2015, Ms. Pena took P.S. to work with her due to the growing tension between her and defendant over disciplining P.S.[15]
P.S.'s grandmother, Brendell Stewart, testified that Ms. Pena and Delmus, her son, shared custody of P.S. and that when Delmus picked P.S. up from Ms. Pena on Sunday, March 15, 2015, he was not feeling well. Delmus brought P.S. to Mrs. Stewart who gave him a bath while her son went to Walgreens to purchase Pedialyte, which P.S. drank. Mrs. Stewart recalled that she watched P.S. the following day, Monday, March 16, 2015, while Delmus was at work and testified that P.S. ate cereal for breakfast and then watched television for most of the day because he was still feeling ill. Mrs. Stewart testified that P.S. also ate lunch that day, and even though P.S. seemed to be improving, she could tell he was still not feeling well. When her son returned home, they brought P.S. to an urgent care facility.
Dr. Susan Vaught, an expert in the field of general and internal medicine, treated P.S. at her urgent care facility on March 16, 2015, two days before his death. P.S.'s father, Delmus, reported that P.S. had started with fever four days prior, which had been intermittent, with a maximum temperature of 100.0, vomiting which also started four days prior and lasted only two days, with no cramping, abdominal pain, diarrhea or constipation, chronic chills which were not severe, and a decreased appetite with upset stomach. When Dr. Vaught met with P.S., she noted that he was walking and standing near his father, and was not cheerful, yet did not appear obviously sick. Dr. Vaught observed that his vitals were within normal range with the exception of his temperature presenting as a low grade fever. P.S. allowed Dr. Vaught to lift him onto the exam table where she conducted a physical examination on him, including an extensive abdominal examination. During the abdominal *1220 examination, she palpated all four quadrants, including deep into the upper right quadrant where the liver was located, to determine whether it was enlarged or inflamed. She noted P.S.'s abdomen was normal to palpation, his abdomen was not rigid or distended, was not tender, and active bowel sounds were present. Dr. Vaught testified that had P.S. been suffering from an acute liver injury, he would have cried, screamed, or bent his knees to keep her from touching his abdomen if palpation was attempted. With no abnormalities found during P.S.'s examination, Dr. Vaught diagnosed P.S. with acute gastroenteritis (stomach virus) with instructions to alternate between Tylenol and Ibuprofen for his fever.[16]
Delmus and Mrs. Stewart brought P.S. home, and by the next morning, Tuesday, March 17, 2015, P.S. was up and running around. Delmus left for work, and after breakfast, Mrs. Stewart took P.S. for a walk to the park where he played on the slide before walking back home. Once back at Mrs. Stewart's house, P.S. had lunch, ice cream, and watched television before taking a nap. Mrs. Stewart recalled that when he awoke, he was somewhat cranky, before she returned P.S. to his father.
Delmus Stewart testified that he picked P.S. up from Ms. Pena on Sunday March 15, 2015, and that Ms. Pena told him that P.S. had a fever and had been sick all weekend. Delmus observed that P.S. only wanted to be held and appeared to be in pain. The following morning, he was still not feeling well, so his mother offered to watch him for the day. That afternoon Delmus and his mother brought him to the urgent care facility out of an abundance of caution. Delmus testified that the next morning, Tuesday, March 17, 2015, P.S. was doing better, but still was not one hundred percent, so he again left P.S. with his mother for the day. Later that day, Delmus returned P.S. to Ms. Pena and advised her that P.S. had been asking for yogurt and told her what had occurred at the urgent care facility. The next morning, March 18, 2015, Delmus checked in on P.S., recalling that Ms. Pena advised him P.S. was doing "a whole lot better." Later that afternoon, at 1:41 p.m., Ms. Pena sent another text message picture to Delmus of P.S. crying after having woken up from his nap, which Delmus stated was not abnormal behavior for P.S. The next time Ms. Pena contacted Delmus was to inform him that P.S. had stopped breathing and was being transported to the hospital. Delmus testified that he and defendant never had a good relationship with one another and that defendant was "aggressive." He further testified that none of the other caregivers that watched P.S. were, or would have ever been, aggressive or rough with P.S.
Robbie Poupart, a former manager at NOLA Motor Sports where Ms. Pena worked, testified that he had the occasion to meet P.S. the few times Ms. Pena brought him to work with her. He described P.S. as friendly and outgoing, with a good sense of humor. He recalled that on the morning of March 18, 2015, P.S. was quiet, kept to himself, and mostly played on his iPad. It appeared to Mr. Poupart that P.S. had a cold, but he did not seem to be in any obvious pain, was not crying, and was walking around.
Francisco Yannini, also a former employee at NOLA Motor Sports, testified that he had interacted with P.S. on many occasions prior to March 18, 2015, when Ms. Pena brought him to work with her. He recalled that he was acting normal on the morning of March 18, 2015 and even ran into his office, sat on his lap, and played a game with him on his iPad. Mr. Yannini testified that P.S. went into his *1221 office a few times during the day attempting to get his attention and that he did not notice anything different about him that morning. Later in the day, Mr. Yannini noticed that he became "fussy," appearing as if he wanted to leave, so he picked P.S. up and walked him around the store offering him something to drink and/or eat which P.S. declined.
Brandon Naumann testified that he has known Ms. Pena since elementary school and that they worked together at NOLA Motor Sports. Like Mr. Poupart and Mr. Yannini, Mr. Naumann had met P.S. on prior occasions when Ms. Pena brought him to work with her. He also saw P.S. on the day of his death and believed P.S. appeared to have "a little cold." He said that P.S. played on his iPad for most of the day before he was picked up by defendant.
Dr. Neha Mehta, director at the Audrey Hepburn Care Center of Children's Hospital and an expert in the field of pediatrics and child abuse pediatrics, testified that given the extent of the laceration on P.S.'s liver, she would not expect him to have been eating, even small amounts of a muffin or yogurt, walking, engaging in any physical activity, or able to sit for extended periods of time. Dr. Mehta explained that a child with blood in his abdomen would be in a lot of discomfort and would not be mistaken for a normal child. She further explained that if a child who was bleeding from his liver was palpated on his abdomen by a doctor, she would have expected to see him wince, flinch, experience pain or discomfort, or give some indication that he did not want to be touched in that area of his body. Dr. Mehta testified that in her experience evaluating children for abuse, there are often times when the child presents with no external markings, yet has suffered internal damage to his/her organs or bones. In a place like the stomach, Dr. Mehta confirmed that even with a very forceful rapid impression/decompression of the organs, there may not be any external indication of an injury. She also noted that while she would expect a lack of appetite and vomiting with the type of liver injury P.S. sustained, she would not necessarily expect a fever.
Ten-year-old Victor Becnel, Jr., defendant's son, gave a statement to Detective Donald Zanotelli on April 3, 2015, following the autopsy findings on P.S.'s death. During his statement, he told the police that on the day of P.S.'s death, defendant picked him up from school and that no one else was with him in the car.[17] Victor, Jr. stated that defendant "rushed" home from school to "finish taking care of" P.S. When they returned home, P.S. was inside the house on the floor of the master bathroom not moving. He recalled that defendant started yelling and cursing and then called 9-1-1. The information provided to Detective Zanotelli differed from Victor, Jr.'s trial testimony in which he testified that P.S. was in the car with defendant when he was picked up from school. On cross-examination, Victor, Jr. testified that defendant had certain rules in the house and that the extent of discipline on P.S. was minimal "like a small slap on the hand or something."
Detective Gabriel Faucetta testified that based on his role as lead investigator in the homicide of P.S., he opined that the evidence gathered in this case established that the trauma which caused P.S.'s death occurred on March 18, 2015, while he was *1222 in the custody of defendant. He further testified regarding a jailhouse call made by defendant to his father on August 3, 2016, the day before defendant's son was scheduled to meet with the district attorney about this case. On the call, defendant's father stated, "he's [Victor, Jr.'s] instructed to say I don't know, I don't remember," to which defendant responded, "that'll work."
Kanisha Taylor, a former long-time friend of Ms. Pena's, testified that Ms. Pena was a caring mother who would never physically harm her children. She further testified that after P.S. died, Ms. Pena confided in her about the abuse she suffered by defendant. Ms. Taylor said that Ms. Pena informed her they had an abusive relationship and that defendant would "put his hands on her," and that one time "he dragged her and she told him to stop and he didn't."
Alicia Gullage, also a former long-time friend of Ms. Pena's, testified that Ms. Pena told her that defendant was "a great provider," physically abusive on two occasions, and "very mentally abusive." She further testified regarding text messages sent between Ms. Pena and herself in which they discussed the idea of opening a daycare in P.S.'s name, to which Ms. Gullage responded, "as long as [defendant] don't whip or torcher [sic] none of the damn kids."[18] Ms. Gullage testified that she and Ms. Pena were "just joking because it was like [defendant] is a big disciplinarian, so we were like, I mean you know he is going to intimidate the kids." She further stated that while Ms. Pena and defendant have watched her own children in the past, she would no longer feel comfortable with defendant watching them.[19]
After the State rested, the defense called Jaime Hernandez, a maintenance worker at NOLA Motor Sports, who testified that he observed Ms. Pena in the morning hours of March 18, 2015, holding P.S., whom he had never met before, while he was whining/crying. He recalled that Ms. Pena had told him P.S. had just woken up from a nap.[20]
Defendant also called Dr. Michael Baden, an expert in forensic pathology, who was consulted on the death of P.S. at defense counsel's request. After review of the evidence in this case, including Dr. Garcia's autopsy report, the autopsy photographs, the microscopic slides of the tissues prepared in Dr. Garcia's office, Dr. Cheek's report, ambulance records, urgent care records, West Jefferson Hospital records, police reports, statements of various witnesses, and the trial testimony of the doctors who testified in this case, Dr. Baden concluded (agreeing with Dr. Garcia) that the cause of P.S.'s death was blunt force trauma to the abdomen. However, he disagreed with Dr. Garcia on the timing of the trauma and as a result, whether it was a homicide or an accident because it was unwitnessed. He further opined that the microscopic examination of the tissue taken from P.S.'s liver showed a remote injury *1223 which was likely seven days old, based upon the time P.S. started to develop symptoms. Dr. Baden stated that vomiting and loss of appetite are symptoms of a liver injury. Dr. Baden said that in his examination of the slides, he believed that P.S. suffered from a remote subcapsular injury which gradually and increasingly bled, resulting in the tearing of the capsule surrounding the liver, causing it to spill into the abdominal cavity. He stated that when a capsule tears, it creates a fresh hemorrhage, which was present on P.S.'s liver and was the result of the rupturing of the capsule from the gradual accumulation of blood and not the result of a "second blow."
Dr. Baden testified that when Dr. Vaught examined P.S. in her clinic, there was no blood in his abdomen, as the liver had not yet ruptured, so the injury was unable to be diagnosed. Dr. Baden found it unlikely that P.S. would have sustained two injuries to the same spot on his liver; however, he agreed that a punch in the stomach could hasten the rupture. He also testified that while Dr. Garcia relied on the fact that she did not observe any clotting around the liver to disprove his theory regarding the gradual bleed into the liver's subcapsule, he contended that the photographs of the pancreas, which is next to the liver, appeared to show clotted blood, which he believed supported his theory that the injury had been present for a number of days prior to the bursting of the liver capsule on the day of P.S.'s death.
Dr. Baden was presented with information that P.S. was in school on March 11, 2015 and began vomiting on the following day, indicating to him that while he could not rule out that somebody may have struck the child, he opined that the same injury could have occurred if the child's abdomen came in contact with a handle bar of a tricycle, from wrestling with other children, or falling against a table. Dr. Baden testified that one could sustain damage to their liver, which had yet to rupture, and that it would not interfere with walking or talking. Dr. Baden agreed with Dr. Mehta in her assessment that P.S. would not have been playing or running around had he had blood in his abdomen, noting that the capsule which contained the blood had not yet ruptured and spilled into the abdominal cavity at the time P.S. engaged in those activities.
During rebuttal, the State recalled Dr. Garcia. Dr. Garcia testified that despite Dr. Baden's conclusion to the contrary, during the autopsy, she found evidence of an acute injury on P.S.'s liver based on the presence of acute inflammatory cells and areas of recent hemorrhage in the mesentery and behind the liver. She explained that in her experience, having performed autopsies on other children who suffered from the same injury, blunt force trauma from hitting an object such as a bicycle handle bar or from a motor vehicle accident leave a mark on the child's skin, whereas blunt force trauma caused by the hands of another person often do not. Further, had P.S.'s liver been bleeding for a week, Dr. Garcia stated that she would have expected to see diffuse bleeding under the capsule, which she did not. Dr. Garcia explained that there was no overlying skin injury on P.S. and no evidence of any bleeding, whether remote or recent, into the tissue in between the skin and the lining of the abdomen, which aided in her decision, among other factors, to categorize P.S.'s death as a homicide.
Dr. Leron Finger, an expert in the field of pediatric critical care, also testified for the State during rebuttal. He explained that liver lacerations in children occur after a traumatic injury and that a child suffering from such an injury, even if the liver was only bleeding within the capsule, would not run around and play, but rather *1224 would be incredibly uncomfortable, lying still, and not wanting anyone to touch his abdomen. He testified that had P.S. been actively hemorrhaging, or had a subcapsular hemorrhage that was continuously bleeding, P.S. would not have allowed Dr. Vaught to press down on his abdomen without exhibiting signs of discomfort, such as screaming or pushing her hands away, regardless of the location of the laceration on the liver. He opined that in his experience treating children with liver lacerations, and based upon a review of the trial testimony of Dr. Baden, the medical records from West Jefferson Hospital and the urgent care office visit on March 16, 2015, as well as the pathology reports from Drs. Garcia, Cheek, and Baden, along with witness statements from employees at NOLA Motor Sports, while not denying the presence of a remote liver injury, Dr. Finger found it more likely that P.S. suffered from an acute injury of some type with a remote injury that had healed given the child's continued improvement in the days leading up to his death.[21]
ASSIGNMENT OF ERROR NUMBER ONE
Sufficiency of the evidence
In his first assignment of error, defendant argues the trial court erred in failing to grant his motion for a new trial and/or motion for post-verdict judgment of acquittal because the State failed to prove criminal negligence on count one and any attempt to intimidate or influence Ms. Pena's testimony on count two. With respect to count one, he submits that there was no evidence put forth by the State regarding the actions of defendant which constituted criminal negligence. Thus, defendant claims no rational trier of fact could have found the State bore its burden of proving the element of criminal negligence on the part of defendant, or that no other adult who interacted with P.S. the week prior to his death was not as, or more, criminally negligent. Additionally, with respect to count two, defendant maintains the State failed to prove Ms. Pena was intimidated by defendant or Walter Jenkins based solely on the jail phone calls introduced at trial.
The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal. La. C.Cr.P. art. 821 ; State v. Hooker , 05-251 (La. App. 5 Cir. 1/17/06), 921 So.2d 1066, 1074. In the present case, defendant filed a motion for post-verdict judgment of acquittal contesting sufficiency of the evidence used to convict him of negligent homicide and witness intimidation. The trial court denied defendant's post-verdict motion, finding the evidence on both counts sufficient.[22]
The appropriate standard of review for determining sufficiency of the evidence was established in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). According to Jackson , the standard is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. Under the Jackson standard, a review of a criminal conviction record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. State v. Flores , 10-651 (La. App. 5 Cir. 5/24/11), 66 So.3d 1118, 1122.
*1225 Rather, the reviewing court must decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson , 443 U.S. at 319, 99 S.Ct. 2781 ; see also State v. Ortiz , 96-1609 (La. 10/21/97), 701 So.2d 922, 930, cert. denied , 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998) ; State v. Holmes , 98-490 (La. App. 5 Cir. 3/10/99), 735 So.2d 687, 690. It is not the function of the appellate court to assess credibility or re-weigh the evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442, 443. The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. State v. Bradley , 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80, 84, writ denied , 03-2745 (La. 2/13/04), 867 So.2d 688.
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams , 05-59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833. When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Wooten , 99-181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied , 99-2057 (La. 1/14/00), 753 So.2d 208. This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt. Id. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Wooten , 738 So.2d at 675.
Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. State v. Ray , 12-684 (La. App. 5 Cir. 4/10/13), 115 So.3d 17, 20, writ denied , 13-1115 (La. 10/25/13), 124 So.3d 1096. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Id. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient to support a requisite factual finding. State v. Caffrey , 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, 203, writ denied , 09-1305 (La. 2/5/10), 27 So.3d 297. A reviewing court may impinge on the fact-finder's discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Harris , 02-1589 (La. 5/20/03), 846 So.2d 709, 713 (citing State v. Mussall , 523 So.2d 1305, 1310 (La. 1988) ).
Negligent Homicide
Defendant was charged with the second degree murder of P.S., but was found guilty by a jury of the responsive verdict of negligent homicide.[23] At trial, the State proceeded under both theories of murder, specific intent and felony murder, setting forth to prove the murder of P.S. was committed with either the specific intent to kill or inflict great bodily harm and/or while engaged in the perpetration of cruelty to a juvenile.[24]
*1226 Second degree murder is defined as the killing of a human being: (1) when the offender has specific intent to kill or inflict great bodily harm, or (2) when the offender is engaged in the perpetration or attempted perpetration of ... cruelty to juveniles ... even though he has no intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1) and (A)(2). The felony murder provision of La. R.S. 14:30.1(A)(2) contains the circumstances under which a defendant can be found guilty under the felony murder rule, which dispenses with the necessity of proving mens rea accompanying a homicide; the underlying felony supplies the culpable mental state. State v. Small , 11-2796 (La. 10/16/12), 100 So.3d 797, 805. Here, the underlying felony that defendant was alleged to have committed was cruelty to a juvenile, which is defined in La. R.S. 14:93(A)(1) as the "intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." Mistreatment, as used in this statute, means "abuse." State v. Cortez , 96-859 (La. App. 3 Cir. 12/18/96), 687 So.2d 515, 519 (citing State v. Comeaux , 319 So.2d 897, 899 (La. 1975) ). Moreover, to be criminally negligent in his mistreatment or neglect of the child, the defendant must have such disregard for the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. State v. Porter , 99-1722 (La. App. 3 Cir. 5/3/00), 761 So.2d 115, 123 ; see also La. R.S. 14:12.
Generally, the Louisiana Supreme Court has interpreted the felony murder rule to require that a direct act of a defendant or his accomplice cause the death of the victim and has refused to hold persons criminally culpable for setting in motion chains of events that ultimately result in the deaths of others. State v. Myers , 99-1849 (La. 4/11/00), 760 So.2d 310 ; State v. Kalathakis , 563 So.2d 228 (La. 1990) ; State v. Garner , 238 La. 563, 115 So.2d 855 (1959).
Unlike second degree murder, negligent homicide does not require a "direct act" of killing by the defendant. Negligent homicide is "the killing of a human being by criminal negligence." La. R.S. 14:32(A)(1). "Criminal negligence exists when although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La. R.S. 14:12. Ordinary negligence does not equate to criminal negligence; the State is required to show more than a mere deviation from the standard of ordinary care. State v. Jones , 298 So.2d 774 (La. 1974).
In the present case, defendant argues that the State's circumstantial case was insufficient to prove he committed criminal negligence causing the death of P.S. If there is sufficient evidence to convict a defendant of a greater offense, which includes the offense for which defendant was convicted, the evidence will necessarily and automatically, because of Louisiana's statutory system of responsive verdicts, support the conviction for the lesser offense, as long as the defendant did not object to the inclusion of this lesser included offense. State v.Ducksworth , 17-35 (La. App. 5 Cir. 12/13/17), 234 So.3d 225 (citing State v. Schrader , 518 So.2d 1024, 1034 (La. 1988) ; State ex rel. Elaire v. Blackburn , 424 So.2d 246 (La. 1982) ; State v. Cooley , 260 La. 768, 257 So.2d 400 (1972) ). Defendant here did not object to the inclusion of negligent homicide as a lesser included offense. Thus, because we find, as set forth below, that the evidence adduced at trial established that defendant killed P.S. while engaged in the perpetration *1227 of cruelty to a juvenile through his negligent mistreatment of P.S., the evidence is sufficient to therefore convict defendant of the lesser included offense of negligent homicide.
On Wednesday March 18, 2015, three-year-old P.S. died from a lacerated liver sustained as a result of blunt force trauma to the abdomen. The known timeline of events, as relayed by the witnesses in this case, leading up to P.S.'s death began approximately one week prior, on Thursday evening March 12, 2015, when P.S. began vomiting while under the care and custody of Ms. Pena and defendant. The following day, Friday March 13, 2015, P.S. was still ill and unable to drink or eat. That evening, Ms. Pena dropped P.S. off to her mother, Mrs. Benoit, who testified that P.S. slept with her that night and was only able to drink coconut water. Additionally, Mrs. Benoit recalled that on the following day, Saturday March 14, 2015, P.S. watched television for the majority of the day before Ms. Pena picked him up and advised her later that evening that P.S. had begun eating. On Sunday, March 15, 2015, Ms. Pena exchanged custody of P.S. with his father, Delmus. Delmus testified that P.S. had a fever and was not feeling well when Ms. Pena dropped him off. Delmus' mother, Ms. Stewart, testified that the next morning, Monday, March 16, 2015, P.S. was still feeling ill but ate breakfast and lunch. However, out of an abundance of caution, Delmus and his mother brought P.S. to an urgent care facility where, after an extensive abdominal examination by Dr. Vaught, P.S. was sent home with a diagnosis of gastroenteritis. Ms. Stewart recalled that the next morning, March 17, 2015, P.S. was eating, running, and playing. P.S. was back in Ms. Pena's custody that evening, Tuesday, March 17, 2015. The next day, March 18, 2015, the day of P.S.'s death, Ms. Pena took P.S. to visit his great-grandmother and then brought him to work with her. By all accounts, P.S. had improved.
The testimony at trial further established that P.S. was under the sole care of defendant on March 18, 2015 from 2:15 p.m. until approximately 3:20 p.m. Defendant retrieved P.S. from Ms. Pena at her place of employment around 2:15 p.m. on March 18, 2015, and P.S. was pronounced dead approximately two and a half hours later at 4:46 p.m. Defendant told first responder Detective Holley that after having picked P.S. up from his mother, they arrived home, P.S. put his head on the kitchen table, fell out of his chair, and was unresponsive. Defendant's description of the events differed from those relayed by defendant to his friend, Deputy Raymond, in which he stated that when he arrived home, he heard a noise coming from the bathroom, explaining that P.S. was sick and had to be taken to the hospital. The description provided by defendant to Deputy Raymond is also more in line with that given by defendant's son, Victor, Jr., who told the police that when his father picked him up from school at around 3:20 p.m., his father "rushed" home to "finish taking care of" P.S., who was home alone on the floor of the bathroom.[25]
Defendant and Ms. Pena were questioned regarding the events leading up to P.S.'s death, during which it was discovered that Ms. Pena and defendant had arguments about the manner in which to discipline P.S. Ms. Pena told the interviewing detective that defendant did a lot of yelling and would grab, shake, and swing P.S.
*1228 when he would not listen. Documentation from P.S.'s daycare was also introduced into evidence, as noted above, which established that on a number of occasions, various markings were present on P.S. when he arrived at school, including a black eye and a bruise on his face. Additionally, there was no evidence presented, nor any suggestion made, that any of P.S.'s other caregivers were ever abusive towards P.S.
During her interview, Ms. Pena also recounted the instances of physical abuse she herself suffered at the hands of defendant, including defendant having choked her and thrown her head against a wall, confirming her fear of defendant. Defendant's abuse of Ms. Pena was also corroborated by Ms. Pena's friends, Ms. Taylor and Ms. Gullage. Ms. Pena's statements to the police were further bolstered by recorded conversations between Ms. Pena and defendant while defendant was in jail, which were admitted into evidence, lending added credence to the veracity of Ms. Pena's initial statements. Dr. Taylor, an expert in the field of domestic violence, reviewed the evidence in this case and concluded that Ms. Pena suffered from domestic abuse. And although at trial Ms. Pena recanted the statements she had made to the police, stating that she was intimidated by the police, the jury appears to have found this assertion unlikely.
The jury was also presented with the testimony of several expert witnesses. Both State and defense experts agreed that the cause of death was blunt force trauma to the abdomen and that P.S. had sustained a remote trauma to his liver ; however, their opinions diverged as to whether P.S. then subsequently sustained a second acute trauma to his liver on the day of his death caused at the hands of another person.
The State's expert forensic pathologist, Dr. Garcia, explained that the findings of the autopsy revealed characteristics of recent trauma to P.S.'s liver superimposed on a more remote trauma based upon evidence that the liver was in the process of repairing itself from the remote injury when it was re-injured through blunt force trauma, causing the previous injury to bleed acutely and cause P.S's death. Expert pediatric pathologist Dr. Cheek agreed that P.S. had sustained an underlying injury to his liver which led to his death, and further agreed with Dr. Garcia that there was also a superimposed acute event on his liver.
Additionally, Dr. Mehta, an expert in the field of pediatrics and child abuse pediatrics, testified that given the severity of P.S.'s liver laceration, she did not believe P.S. would have been eating, walking, or engaging in any physical activity, which P.S. had been doing prior to his death, lending support to Dr. Garcia's conclusion that a second acute event caused by blunt force trauma occurred on the day of his death.
Conversely, defense expert forensic pathologist, Dr. Baden, testified that while he agreed about there being a remote injury to P.S.'s liver, he believed that the remote (approximately seven days old) subcapsular injury gradually bled into the liver capsule, resulting in the tearing of the capsule around the liver and causing it to spill into the abdominal cavity. Thus, he found that there was no second acute injury caused by another human being on the day of P.S.'s death. Dr. Baden explained that Dr. Vaught was unable to diagnose P.S.'s remote liver laceration because the blood was still contained in the liver capsule and had not yet ruptured and begun to bleed into his abdomen. He believed that the presence of clotted blood near P.S.'s pancreas, next to his liver, supported his theory that the injury had been present for several days prior to the bursting of the liver capsule. Dr. Baden further *1229 opined that a liver laceration could be obtained in a number of ways and not necessarily at the hands of another.
During rebuttal, Dr. Garcia found Dr. Baden's conclusions unconvincing, explaining that blunt force trauma caused by the hands of another often does not leave a mark on the skin, such as in P.S.'s case, which is unlike blunt force trauma sustained from a motor vehicle accident or falling against a hard object. Additionally, had P.S.'s liver been bleeding for a week, Dr. Garcia testified that she would have expected to have seen diffuse bleeding under the capsule, which was not presented during the autopsy.
Dr. Finger, an expert pediatric critical care physician, was also called by the State to refute Dr. Baden's position. While not denying the presence of a remote liver injury, Dr. Finger found it more likely that P.S. suffered from an acute injury of some type and that his remote injury had healed, given P.S.'s continued improvement in the days leading up to his death.
Faced with these conflicting expert opinions, the jury was entitled to accept whichever one better explained the facts of the incident. See La. C.E. art. 702. The jury's decision to accept one expert's opinion over another should not be disturbed by this Court unless that opinion is patently unsound. State v. Johnson , 43,935 (La. App. 2 Cir. 2/25/09), 3 So.3d 697, 704 ; State v. Ellis , 28,282 (La. App. 2 Cir. 6/26/96), 677 So.2d 617, 623, writ denied , 96-1991 (La. 2/21/97), 688 So.2d 521. After reviewing the experts' testimony in their entirety, the opinions of expert witnesses Drs. Garcia and Cheek regarding the cause and manner of death, and Drs. Mehta and Fingers' expert opinions regarding the behavior expected of a child suffering from a liver laceration, are not patently unsound.
In great part, most of the witnesses in this case presented evidence that was circumstantial in nature. However, when viewing the evidence as a whole and in a light most favorable to the prosecution, a rational trier of fact could have reasonably found the evidence supported a conviction for second degree murder in the perpetration of cruelty to a juvenile. Although a compromise verdict may have been reached by the jury, the verdict of negligent homicide is nevertheless valid, given that the evidence presented would have reasonably supported the charged offense. The evidence presented contained enough information to exclude defendant's assertion of innocence and the jury's determinations of credibility should not be disturbed on appeal where the record, as here, includes more than sufficient evidence from which the jury could have concluded the State proved the essential elements of negligent homicide beyond a reasonable doubt.[26] This assignment of error is without merit.
*1230 Witness Intimidation
Defendant was also convicted of intimidating, impeding, or injuring a witness (Ms. Pena), in violation of La. R.S. 14:129.1 which provides, in pertinent part, that no person shall intentionally:
(1) Intimidate or impede, by threat of force or force, or attempt to intimidate or impede, by threat of force or force, a witness[27] or a member of his immediate family with intent to influence his testimony, his reporting of criminal conduct, or his appearance at a judicial proceeding;
La. R.S. 14:129.1(A)(1). (Internal footnote added.)
Defendant argues that the evidence adduced at trial is insufficient to support his conviction for this offense because the evidence presented by the State consisted solely of recorded jail phone calls between Walter Jenkins and himself which failed to prove that Ms. Pena was ever intimidated into changing her testimony.
During the trial of this matter, the State introduced into evidence numerous tape-recordings of telephone conversations between defendant and his friend Walter Jenkins concerning Ms. Pena.[28] All of the conversations between Jenkins and defendant occurred while defendant was in jail awaiting trial on charges stemming from the murder of Ms. Pena's three-year-old child and her initial desire to press criminal charges against defendant for domestic battery. During these conversations, defendant communicated to Jenkins that he wanted him to instruct Ms. Pena to "keep her mouth shut," which Jenkins agreed to do, stating "I told her she already did enough damage." The duo further discussed how critical Ms. Pena's testimony was to the pending murder charge and then agreed upon a strategy for Jenkins to employ against Ms. Pena to ensure her cooperation. Specifically, defendant made reference to various numbers to be utilized by Jenkins, which Jenkins explained at trial was indicative of the amount of force he was instructed to use on Ms. Pena "to get her to shut up." Defendant even offered the use of his car to Jenkins so he could "ride around" with Ms. Pena, and advised Jenkins to "make sure you keep her on my side. Test her loyalty every which way you can."
Additionally, while Jenkins testified that he did not employ the force he and defendant had previously discussed over the phone, and Ms. Pena testified that Jenkins *1231 never threatened to hurt her if she did not change her testimony, a phone conversation between defendant and Jenkins on the evening of April 4, 2015, which was received by Jenkins while at Ms. Pena's house, confirmed that Ms. Pena was "good" and had agreed to "drop all her charges." Moreover, regardless of actually accomplishing his purpose to influence Ms. Pena's testimony, La. R.S. 14:129.1 provides that a person may be found guilty of intimidation of a witness if even an attempt is made to intimidate or impede the witness. Here, the content of defendant's conversations with Jenkins both before and after his meeting with Ms. Pena are sufficient to show defendant's specific intent to intimidate Ms. Pena into altering her trial testimony against him.
Ms. Pena also provided a statement to the police after P.S.'s murder, and although later recanting it, therein detailed instances of domestic violence she suffered at the hands of defendant and confirmed her fear of him. Additional recorded conversations between defendant and Ms. Pena further establish that prior to a scheduled court appearance, defendant told Ms. Pena he was worried because she is "not quick" and then reminded her that she "knows what to do ... you have been practicing this for a long time." Defendant also reminded Ms. Pena that she is "weak." Dr. Taylor, an expert in the field of domestic violence, reviewed the phone conversations that took place between defendant and Ms. Pena and concluded that defendant exhibited power and control over Ms. Pena in a coercive and manipulative way.
Based on the entirety of the record, we find the evidence sufficient to support defendant's conviction for intimidating or attempting to intimidate a witness, concluding that any rational trier of fact viewing the evidence in the light most favorable to the prosecution would have found the essential elements of the crime met by the State beyond a reasonable doubt. This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER TWO
Excessive sentences
In his second assignment of error, defendant argues that the trial court erred when it imposed the maximum sentences for his negligent homicide and witness intimidation convictions on a case where there was no negligence indicated on defendant's part. Defendant further states the trial court failed to justify the imposition of the maximum sentences given his lack of criminal history and his status as both a United States Air Force veteran, and provider for his family.
Failure to make or file a motion to reconsider sentence, or to state the specific grounds upon which the motion is based, limits a defendant to a review of the sentence for unconstitutional excessiveness only. State v. Bolden , 04-1000 (La. App. 5 Cir. 3/1/05), 901 So.2d 445, 447, writ denied , 05-2030 (La. 4/28/06), 927 So.2d 279. See also La. C.Cr.P. art. 881.1(E). In this case, although the record reflects defendant filed a written motion to reconsider sentence, which was denied by the trial court, his motion merely concluded the sentences imposed upon him were excessive. Thus, given the lack of specific grounds alleged, the only issue to be considered is whether defendant's sentences are unconstitutionally excessive. See State v. Alvarez , 11-223 (La. App. 5 Cir. 11/15/11), 78 So.3d 265, 268, writ denied , 11-2767 (La. 4/13/12), 85 So.3d 1245.
The Eighth Amendment to the U.S. Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. State v. Nguyen , 06-969 (La. App. 5 Cir. 4/24/07), 958 So.2d 61, 64, writ denied , 07-1161 (La. 12/7/07), 969 So.2d 628. A sentence is considered *1232 excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense, or imposes needless and purposeless pain and suffering. Nguyen , 958 So.2d at 64.
According to La. C.Cr.P. art. 881.4(D), the appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. In reviewing a sentence for excessiveness, the reviewing court shall consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court's sense of justice, while recognizing the trial court's wide discretion. Nguyen , 958 So.2d at 64 ; State v. Taylor , 06-839 (La. App. 5 Cir. 3/13/07), 956 So.2d 25, 27, writ denied , 06-0859 (La. 6/15/07), 958 So.2d 1179 (citing State v. Lobato , 603 So.2d 739, 751 (La. 1992) ; State v. Pearson , 07-332 (La. App. 5 Cir. 12/27/07), 975 So.2d 646, 655-56 ).
In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Allen , 03-1205 (La. App. 5 Cir. 2/23/04), 868 So.2d 877, 880. However, there is no requirement that specific matters be given any particular weight at sentencing. State v. Tracy , 02-0227 (La. App. 5 Cir. 10/29/02), 831 So.2d 503, 516, writ denied , 02-2900 (La. 4/4/03), 840 So.2d 1213.
The penalty for negligent homicide, a violation of La. R.S. 14:32, when the victim killed is under the age of ten years, carries a term of imprisonment at hard labor "without benefit of probation, parole, or suspension of sentence, for not less than two nor more than five years." La. R.S. 14:32(C)(2)(a). And the penalty for intimidating, impeding, or injuring a witness in a criminal proceeding in which a sentence of death or life imprisonment may be imposed, a violation of La. R.S. 14:129.1, carries a term of imprisonment "for not more than forty years at hard labor."
Prior to sentencing defendant, the trial court listened to, and read, a total of sixteen victim impacts statements from various family members, friends, and one of the first responders, Mr. Frederick, regarding the impact the death of P.S. has had on their lives. The majority of the statements discussed defendant's controlling, unremorseful, and dangerous nature, and expressed their fear for Ms. Pena and her new infant son's lives when defendant is released from prison. Many further implored the trial court to impose the maximum sentences for the crimes of which defendant was convicted.
After considering the victim impact statements, the trial court sentenced defendant to the maximum allowable five-year sentence without the benefit of probation, parole, or suspension of sentence on his conviction for negligent homicide, and to eight years at hard labor, well below the maximum forty years that could have been imposed, on his conviction for witness intimidation.[29] In sentencing defendant, the court found as follows:
*1233 THE COURT:
Now in imposing sentence a trial judge is guided by the sentencing guidelines set forth in Article 894.1 of the Code of Criminal Procedure, which says, "When a defendant has been convicted of a felony the court should impose a sentence of imprisonment if any of the following occurs, paragraphs 2 and 3 apply here, the defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution; and three, a lesser sentence would deprecate the seriousness of the defendant's crimes."
* * *
The jury on count one was charged if you find the defendant guilty of second degree murder, guilty of manslaughter, guilty of negligent homicide or not guilty, and the jury elected to come back with the guilty of negligent homicide, which is when involving a young child such as this carries certain mandatory penalties, and the defendant is not entitled to any consideration of probation.
After considering all the facts of this case, the evidence that I heard, as well as the jury, I believe that a term of five years without benefit of probation, parole or suspension of sentence should be imposed, and accordingly that is what I will impose on count one today after considering the sentencing guidelines. So this defendant on count one is sentenced to a term of five years at hard labor, without benefit of probation, parole or suspension of sentence and he receives credit for time served.
As to count two, this Court today will impose a sentence of eight years, eight years at hard labor. These sentences-and he will receive credit for time served. These sentences will run concurrently as per Article 883 of the Code of Criminal Procedure.
The review of sentences under La. Const. art. 1, § 20 does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is most appropriate in a given case. State v. Williams , 07-1111 (La. 12/7/07), 969 So.2d 1251, 1252 (per curiam ). Further, when an appellate court is reviewing a sentence, the relevant question is not whether another sentence might have been more appropriate, but rather whether the trial court abused its broad sentencing discretion. State v. Walker , 00-3200 (La. 10/12/01), 799 So.2d 461, 462 (per curiam ).
The record reflects that the trial judge considered the victim impact statements detailing defendant's lack of remorse displayed throughout the trial, and found defendant to be in need of correctional treatment most effectively provided by his commitment to an institution, and further found that a lesser sentence would deprecate the seriousness of defendant's crimes. In sentencing defendant to the maximum five-year sentence for negligent homicide, and the well-below maximum sentence of eight years for witness intimidation, the trial court noted that he considered jurisprudence and the facts and evidence adduced at trial. While the egregious nature of the facts of this case were not reiterated *1234 by the trial court at sentencing, the trial court presided over the trial of this matter and heard the testimony of the five centimeter laceration P.S. sustained to his liver as a result of blunt force trauma at the hands of defendant, which caused his abdominal cavity to fill with a pint of blood as he lay on the bathroom floor. The court further listened to the testimony of Detective Francis who described defendant's behavior following P.S.'s death as dismissive and uncaring. Defendant's aggressive nature was also recounted for the trial court through the testimony of various witnesses detailing defendant's irate reaction to P.S.'s death and the mental and physical abuse defendant inflicted upon others. Trial testimony also established defendant's disagreement over the discipline of P.S. and his prior actions of shaking, grabbing, and swinging the three-year-old victim. The manipulative and controlling tactics employed by defendant during the pendency of this case were also brought to light at trial, including defendant's disregard for the well-being of Ms. Pena's newborn child, and the instructions provided by defendant to his friend, Walter Jenkins, authorizing the use of force against Ms. Pena so as to test her "loyalty every which way." Thus, although defendant appears to have been a first-time offender, when considering the nature of the crimes, the sentences imposed are supported by the record.
Also, with respect to defendant's five-year sentence for negligent homicide, the jurisprudence reflects that the maximum penalty has been imposed in circumstances arguably less egregious than those presented in this case. For example, in State v. Hughes , 03-420 (La. App. 3 Cir. 12/31/03), 865 So.2d 853, writ denied , 04-663 (La. 9/24/04), 882 So.2d 1165, the Third Circuit affirmed a five-year sentence for negligent homicide. In Hughes , the defendant and her estranged husband got into an argument, and she attempted to commit suicide by driving her car into the path of a pickup truck driven by the victim. The victim died as a result of the impact. Even though the defendant was a first-time felony offender and the mother of four children, the court of appeal held that the maximum five-year sentence was not excessive. Also, in State v. Wry , 591 So.2d 774 (La. App. 2nd Cir. 1991), the facts indicated the defendant was under treatment for a stress disorder and was taking Xanax. After taking Xanax and consuming alcohol, the defendant drove his vehicle, resulting in a head-on collision with another vehicle, killing the victim on impact. Further, in State v. Daranda , 398 So.2d 1053 (La. 1981), a five-year sentence for negligent homicide arising from acts committed by a person while driving under the influence of alcoholic beverages was affirmed by the Louisiana Supreme Court. Finally, in State v. Edwards , 92-1458 (La. App. 3rd Cir. 1993), 626 So.2d 501, writ denied , 93-3125 (La. 2/3/95), 649 So.2d 400, the defendant was charged with the second degree murder of his girlfriend's four-year-old daughter. The State later dismissed the indictment and filed two bills of information charging the defendant with negligent homicide and cruelty to a juvenile where the facts established that the victim was being disciplined when she slipped and fell, striking her head, and was left unattended by the defendant during which time the victim fell again, fatally injuring herself. The defendant pled guilty as charged and was sentenced to five years imprisonment on the negligent homicide charge and to nine years imprisonment on the cruelty to a juvenile charge. The defendant was a thirty-seven-year-old first-time offender with a college degree, who was a self-employed architect. The court of appeal found that the sentences imposed were not excessive.
*1235 Additionally, as previously set forth supra , it appears that with respect to count one, the evidence adduced at trial would have supported a second degree murder verdict and exposed defendant to a mandatory life sentence under La. R.S. 14:30.1. "In considering the nature of the offense, both the trial court and the reviewing court may assess whether the crime for which defendant has been convicted adequately describes his conduct when the conviction is for a lesser included responsive offense to the crime charged." State v. Lewis , 09-1404 (La. 10/22/10), 48 So.3d 1073, 1078 (citing State v. Lanclos , 419 So.2d 475, 478 (La. 1982) ). This general sentencing principle accommodates Louisiana's responsive verdict scheme which provides the fact-finder, ordinarily a jury in felony cases, with the discretion to return verdicts for lesser included offenses against the weight of the evidence presented at trial. Lewis , 48 So.3d at 1078 (citing State v. Porter , 93-1106 (La. 7/5/94), 639 So.2d 1137, 1140 ). Louisiana courts have found the fact that the evidence might have supported a verdict of second degree murder is an appropriate sentencing consideration where the defendant has been convicted of a lesser offense. See Lewis , supra ; State v. Roussel , 424 So.2d 226, 231-32 (La. 1982), overruled on other grounds by State v. Jackson , 480 So.2d 263, 268. In the present case, although defendant was sentenced to the maximum allowable five-year sentence for negligent homicide, his sentence term falls considerably short of the life imprisonment the Louisiana legislature has deemed adequate to describe the moral culpability of his conduct. Further, defendant was given credit for the time he has already served.
As for the sentence of eight years on the charge of witness intimidation, this sentence is in the lower range of possible sentences that the trial court could have imposed. While no similar cases were found regarding the imposition of an eight-year sentence for witness intimidation after La. R.S. 14:129.1 was amended in 2008 to provide for more stringent sentencing ranges, other cases imposing the maximum sentence prior to the 2008 effective date of the amendment have been found constitutional. (See State v. Parent , 02-835 (La. App. 5 Cir. 12/30/02), 836 So.2d 494, 497, writ denied , 03-0491 (La. 10/31/03), 857 So.2d 472, where the defendant received sentences of five years at hard labor on each of his three counts of intimidating a witness; State v. Mayeaux , 570 So.2d 185, 188 (La. App. 5th Cir. 1990), writ denied , 575 So.2d 386 (La. 1991), where the defendant was sentenced pursuant to a multiple bill to twenty years at hard labor for his aggravated battery conviction, five years at hard labor for his criminal conspiracy conviction, and five years at hard labor for his witness intimidation conviction, with each sentence to be served consecutively; State v. Davis , 05-101 (La. App. 5 Cir. 7/26/05), 911 So.2d 295, writ denied , 05-2312 (La. 5/26/06), 930 So.2d 14, where the defendant's maximum sentence of five years at hard labor, which ran consecutively to his prior sentence for violating a protective order, was found not to be unconstitutionally excessive, where his conduct had displayed a total disregard for the deterrent effect of police presence and for non-incarceration alternative measures, such as protective orders designed to protect the victim.)
After considering the severity of the crimes committed in this case, including the killing of an innocent three-year-old child whose mother was instructed to "keep her mouth shut," and for which defendant could have been convicted of second degree murder, we find that the maximum five-year sentence imposed with respect to defendant's negligent homicide conviction and his eight-year sentence for witness intimidation are not unconstitutionally excessive, as they are neither *1236 grossly disproportionate to the offenses, nor do they constitute a needless infliction of pain or suffering. Thus, in light of the facts of the case, the nature of the crimes, and the jurisprudence, the trial court did not abuse its discretion in imposing the sentences in this case. This assignment of error is without merit.
ERRORS PATENT REVIEW
The record was reviewed for errors patent, according to La. C.Cr.P. art. 920, State v. Oliveaux , 312 So.2d 337 (La. 1975), and State v. Weiland , 556 So.2d 175 (La. App. 5th Cir. 1990). Upon review, we find only one matter that requires corrective action.
There is a discrepancy between the commitment and the record. The commitment reflects that defendant was found guilty on count one of the "amended charge" of negligent homicide. This statement is inaccurate as the record reflects that count one was never amended; rather, the jury found defendant guilty of the "lesser included" offense of negligent homicide. This Court has previously remanded a case for correction of the commitment in its errors patent review. See State v. Lyons , 13-564 (La. App. 5 Cir. 1/31/14), 134 So.3d 36, writ denied , 14-481 (La. 11/7/14), 152 So.3d 170 (citing State v. Long , 12-184 (La. App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142 ). Accordingly, we remand this case and instruct the trial court to correct the commitment for accuracy purposes with regard to the noted discrepancy.
CONCLUSION
For the foregoing reasons, defendant's convictions and sentences are affirmed. The matter is remanded to the trial court for correction of the commitment as described above.
AFFIRMED; REMANDED FOR CORRECTION OF THE COMMITMENT

The victim's initials are used under the authority of La. R.S. 46:1842(3)(a) and 46:1844(W)(3), which allow this Court to identify a victim of a homicide who is also a minor by using his or her initials.

The trial court retained jurisdiction to rule on defendant's motion to reconsider sentence after his appeal had been granted pursuant to La. C.Cr.P. art. 916.

Defendant was the live-in boyfriend of P.S.'s mother, Nelly Pena.

Dequeant testified that there was a red substance on the towel, which was not blood but looked like P.S. may have vomited.

Defendant told Fireman Frederick that he had not administered CPR to P.S. prior to their arrival. However, on the 9-1-1 call made at 3:44 p.m., defendant is heard telling the dispatcher, "I need an ambulance quickly, a child has stopped breathing." When asked by the dispatcher whether defendant wished to perform CPR, defendant advised the dispatcher that he was certified in CPR and knew how to do it.

At the time of P.S.'s death, Ms. Pena also had a four-month old baby girl with defendant.

The State introduced a child observation report from Boutte Christian Academy Daycare indicating that on January 9, 2015, P.S. was observed to have a black eye, which Ms. Pena said occurred from a fall at home, and on February 13, 2015, P.S. was observed with a bruise on his face, which Ms. Pena claimed "he woke up like that."

Sergeant Gai, who interviewed Ms. Pena, testified to the contrary. He confirmed that he did not force Ms. Pena to speak with him and never threatened Ms. Pena into making her statements. Further, in her statement, Ms. Pena confirmed that the information she provided was true and correct to the best of her knowledge, that she had been treated fairly, and that she had not been tricked, threatened, or promised anything of value in exchange for her statement.

On cross-examination, Ms. Pena stated that at one time, defendant was arrested for domestic violence by strangulation, but charges were never brought against him.

At trial, Ms. Pena denied that Jenkins ever threatened to hurt her if she did not change her story.

On the recording, defendant instructed Ms. Pena to obtain a restraining order against the man, to "make him leave" her alone, to which Ms. Pena stated, "that's extreme."

Dr. Garcia noted that the blood taken from P.S.'s abdomen was fluid and had not yet begun postmortem clotting.

Dr. Garcia acknowledged that her opinion differed from defense expert, Dr. Michael Baden, who believed that the child had sustained an injury to his liver seven to ten days prior to his death and that the remote injury eventually caused the liver to rupture resulting in P.S.'s death. While Dr. Garcia's opinion differed from Dr. Baden, she explained that in reaching her conclusions, she took into consideration the fact that the blood in P.S.'s abdomen had not yet started to clot at the time she performed her autopsy and that upon review of P.S.'s medical records from his urgent care office visit, she noted that the records indicated P.S.'s abdominal examination was negative for any tenderness, pain, or trauma. Additionally, she confirmed her disagreement with Dr. Baden's conclusion-that there was subcapsular bleeding in the liver for a week prior to his death-because for such an interpretation, she would have expected to see more diffuse subcapsular bleeding than what was present during the autopsy and some clotting of the blood.

Dr. Cheek testified that calcifications begin developing several days to a week or two after the injury is sustained.

Sergeant Gai said that while Ms. Pena's statement generally indicates that P.S. went to work with her on the day of his death because he was unable to attend school that day, during his pre-interview with Ms. Pena, she stated that she was scared of defendant and believed he may want to hurt her son. When he questioned Ms. Pena as to why she did not leave P.S. with defendant that day, she replied "I wanted to spend more time with him. I mean sometimes like I said I would be like that's my son, I deal with him."

The autopsy revealed no signs of gastroenteritis.

Cristin Menyweather, principal at Charbonnet Elementary School, testified that on March 18, 2015, the school dismissal time was 3:20 p.m. Defendant made the call to 9-1-1 at 3:44 p.m.
The record suggests that the four-month-old baby and P.S. were at home alone when defendant left to pick up his son from school.

On the detailed text message log between Ms. Pena and Ms. Gullage, there contains a text message from Ms. Pena in which she states to Ms. Gullage that defendant "whips all kids."

Ms. Pena denied having told her former friends Kinesha Taylor and Alicia Gullage that defendant physically abused her. She further testified that she and Ms. Gullage reconnected shortly before P.S.'s death and that after defendant was incarcerated, Ms. Gullage told Ms. Pena that if defendant were to be released, she would never allow defendant to watch her children.

Mr. Hernandez did not report this information to the police, but rather, came forward with this information after speaking with Ms. Pena who put him in touch with defendant's defense team.

Dr. Baden conceded that Dr. Finger would know more than him about injured children and how they behave and are treated for a liver injury such as the one sustained by P.S. in this case.

Notably, defendant raised additional grounds for his post-verdict judgment of acquittal that he does not raise on appeal.

Under the provisions of La. C.Cr.P. art. 814(A)(3), negligent homicide is a responsive verdict to a charge of second degree murder.

The jury was instructed on the law as it relates to both specific intent murder and murder while the offender is engaged in the perpetration of cruelty to juveniles.

Notably, at trial, Victor, Jr. changed his account of the events, testifying that P.S. was in the car when defendant picked him up from school. However, on a jailhouse phone call between defendant and defendant's father, it was confirmed that Victor, Jr. had been instructed regarding his testimony.

See State v. Miller , 15-720 (La. App. 3 Cir. 2/3/16), 185 So.3d 264, where the defendant was charged with the second degree murder of his girlfriend, and the jury convicted him of the responsive verdict of negligent homicide. The Third Circuit found the evidence sufficient to convict the defendant of the charged offense, and thus, the responsive verdict, where the State presented three medical experts-which contradicted that of the defense experts-whose testimony indicated the victim died of multiple traumatic injuries intentionally inflicted, and that her death was not the result of drugs and alcohol as claimed by the defense. At trial, the defendant's own testimony placed him with the victim during, or at least proximate to, the time her fatal injuries were inflicted.
Compare State v. Greenard , 44,681 (La. App. 2 Cir. 11/12/09), 26 So.3d 239, writ denied , 09-2690 (La. 6/4/10), 38 So.3d 299, in which the homicide victim, age twelve, was a resident at a youth ranch and was known for malingering and faking illness to get out of work. On the day of his death, in September, the heat index was 103 degrees. He was placed on in-school suspension and his punishment, which consisted of running laps and mowing outdoors, ultimately resulted in him being dragged and kicked around the ranch by supervisors and other residents, all while being denied water throughout the day, resulting in his death that afternoon. The pathologist determined that the cause of death was environmental hyperthermia with blunt force head trauma. The court held that the victim's inexorable descent toward death was well in place before the defendants ever reported to work that afternoon. The record was also ambiguous and contradictory as to the precise cause of death. Therefore, the Second Circuit found that the evidence was insufficient to prove beyond a reasonable doubt that the defendants were guilty of negligent homicide under La. R.S. 14:32. However, the court did find that the defendants' actions in leaving the victim lying in the sun and in a parking lot unquestionably added to his suffering and were sufficient to support their convictions for cruelty to juveniles under La. R.S. 14:93.

La. R.S. 14:129.1 defines the term "witness" to include a person who is a victim of criminal conduct, a person who has testified in court under oath, a person who has reported a crime, a person who has been served with a court subpoena, and a person who reasonably would be believed by an offender to be a witness.

Jenkins was also charged along with defendant with witness intimidation and pled guilty to a reduced charge of failure to report a felony.

Defendant's contention that he received a maximum sentence on both counts is misplaced, as defendant received eight years, and not forty years, for his conviction under La. R.S. 14:129.1. (Defendant's sentencing exposure for this charge was up to forty years under La. R.S. 14:129.1(C)(2), because defendant could have been sentenced to life imprisonment on the charge of second degree murder, had the jury found defendant guilty as charged.)
The trial court's statement that defendant was required to be sentenced under the attempt statute (La. R.S. 14:27, which provides for a term of imprisonment of one-half the longest term of imprisonment prescribed for the offense) because both the State and the jury found him guilty of attempt to intimidate or impede a witness, is misplaced. La. R.S. 14:129.1 is a crime which includes attempt as an element of the charged offense, providing that a conviction can be obtained under La. R.S. 14:129.1 if it is proven that a person "attempt[ed] to intimidate or impede, by threat of force or force," a witness and is not required to be charged as a separate offense (i.e. , a defendant would not be charged with La. R.S. 14:(27)129.1). Thus, whether defendant actually intimidated Ms. Pena or only attempted to intimidate Ms. Pena, sentencing under La. R.S. 14:129.1 is the same. Regardless, it is noted that the sentence on count two falls within both of the ranges set forth under La. R.S. 14:129.1(C)(2) and La. R.S. 14:27.